**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 24-5075**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

NEW MEXICO CATTLE GROWERS' ASSOCIATION,

*Plaintiff-Appellant*,

v.

UNITED STATES FISH AND WILDLIFE SERVICE, et al.,

*Defendants-Appellees*,

v.

CENTER FOR BIOLOGICAL DIVERSITY; MARICOPA AUDUBON
SOCIETY,

*Defendants-Intervenors-Appellees*.

On Appeal from the United States District Court
for the District of Columbia Case No. 1:21-cv-03263-ACR

---

**INITIAL BRIEF FOR DEFENDANTS-INTERVENORS-APPELLEES**

---

Ryan Shannon
Telephone: (971) 717-6407
rshannon@biologicaldiversity.org
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211

Margaret E. Townsend
Telephone: (971) 717-6409
mtownsend@biologicaldiversity.org
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211

*Attorneys for Defendants-Intervenors-Appellees*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rules 28(a)(1) and 26.1, counsel for Defendants-Intervenors-Appellees the Center for Biological Diversity and Maricopa Audubon Society certify as follows:

### A.    Parties:

All parties appearing before the district court and in this Court are listed in Appellant's Opening Brief.

### 1.    Rule 26.1 Disclosure Statement

Corporate Defendants-Intervenors-Appellees are non-governmental organizations that work through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction. Corporate Defendants-Intervenors-Appellees are 501(c)(3) non-profit organizations that hereby state pursuant to Circuit Rule 26.1 that they have no parent companies, are not publicly traded, and that no publicly held company owns 10 percent or more of any of their stock.

### B.    Ruling Under Review

References to the ruling under review appear in Appellant's Opening Brief.

### C.    Related Cases

Counsel for Defendants-Intervenors-Appellees are aware of no related cases before this or any other court.

*/s/ Ryan Adair Shannon*
Ryan Adair Shannon
D.C. Cir. Bar No. 62394
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
T: 971-717-6407
F: 503-283-5528
E: rshannon@biologicaldiversity.org

Margaret E. Townsend
D.C. Cir. Bar No. 65252
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
T: 971-717-6409
F: 503-283-5528
E: mtownsend@biologicaldiversity.org

*Counsel for Defendants-Intervenors-Appellees*
*Center for Biological Diversity and Maricopa*
*Audubon Society*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................v

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ................................. viii

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................1

STATUTES AND REGULATIONS....................................................2

STATEMENT OF THE CASE................................................................3

   I.    Introduction....................................................................................3

   II.   The Endangered Species Act.........................................................3

   III.  Factual Background .......................................................................6

       A.   The role of "subspecies" in avian taxonomy and conservation...............6

       B.   The endangered southwestern willow flycatcher ...................................8

       C.   The Service's Denial of Cattle Growers' Delisting Petition .................11

           1.   Cattle Growers' Delisting Petition.................................................11

           2.   The Service's species status review and comments.......................11

           3.   The Service's Denial .....................................................................13

   IV.  Procedural History .......................................................................17

STANDARD OF REVIEW ........................................................................19

SUMMARY OF ARGUMENT ..................................................................21

ARGUMENT ...........................................................................................25

   I.    The Service's Denial explained the principles and criteria guiding the agency's determination that the southwestern willow flycatcher is a valid subspecies. ....................................................................................25

       A.   The Service is not required to promulgate an independent, generally applicable definition or "falsifiable" standard for "subspecies." ..........28

B.    The Service provided the criteria guiding its determination and explained why the southwestern willow flycatcher is a valid subspecies according to those criteria and the best available science. ...................31

C.    By providing and adhering to these principles, the Service did not engage in standardless rulemaking incapable of "falsification." ...........34

II.   Cattle Growers misrepresent the Service's well-reasoned taxonomic determination that the southwestern willow flycatcher is a valid subspecies in an attempt to relitigate the science. ..........................................................40

A.    The Service's taxonomic decision did not merely accept the majority opinion but appropriately considered and explained the underlying best available science supporting its Denial...................................................40

B.    Cattle Growers' critiques of "non-clinal geographic variation" ignore the Service's analysis, which clearly articulated the non-arbitrary basis for its subspecies determination..........................................................44

III.  The Service's reliance on the standards of the ESA and its implementing regulations does not raise constitutional concerns. .......................................51

CONCLUSION .........................................................................................................55

iv

## TABLE OF AUTHORITIES

**Cases**

*Ala.-Tombigbee Rivers Coal. v. Kempthorne*,
  477 F.3d 1250 (11th Cir. 2007) ........................................................... 39

*Am. Wildlands v. Kempthorne*,
  478 F. Supp. 2d 92 (D.D.C. 2007) ....................................................... 35

*Am. Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008) ............................................................. 19

*Am. Wildlands v. Norton*,
  193 F. Supp. 2d 244 (D.D.C. 2002) ....................................................... 5

*Appalachian Power Co. v. EPA*,
  135 F.3d 791 (D.C. Cir. 1998) ............................................................. 37

*Bldg. Indus. Ass'n v. Norton*,
  247 F.3d 1241 (D.C. Cir. 2001) ........................................................... 38

*Buffalo Field Campaign v. Zinke*,
  289 F. Supp. 3d 103 (D.D.C. 2018) ..................................................... 11

*Chippewa & Flambeau Improvement Co. v. FERC*,
  325 F.3d 353 (D.C. Cir. 2003) ............................................................. 29

*Ctr. for Biological Diversity v. Lohn*,
  296 F. Supp. 2d 1223 (W.D. Wash. 2003) ................................. 5, 27, 36, 37, 52

*Defs. of Wildlife v. Babbitt*,
  958 F. Supp. 670 (D.D.C. 1997) ............................................................ 5

*Defs. of Wildlife v. Zinke*,
  849 F.3d 1077 (D.C. Cir. 2017) ............................................... 45, 48, 51

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
  905 F.2d 438 (D.C. Cir. 1990) ............................................................. 51

*Gundy v. United States*,
  588 U.S. 128 (2019) ............................................................... 51, 53

*Humane Soc'y of the U.S. v. Jewell*,
  76 F. Supp. 3d 69 (D.D.C. 2014) ...................................................... 4, 5

*Humane Soc'y of the U.S. v. Zinke*,
  865 F.3d 585 (D.C. Cir. 2017) .............................................................. 5

*Keating v. FERC*,
    569 F.3d 427 (D.C. Cir. 2009) ............................................................20

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) ............................................................ 23, 40, 48

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) .............................................. 5, 20, 23, 37, 40, 48

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .............................................................. 20, 25, 38

*PDK Labs. v. U.S. DEA*,
    438 F.3d 1184 (D.C. Cir. 2006) ........................................ 21, 26, 29, 30, 31, 47

*Pearson v. Shalala*,
    164 F.3d 650 (D.C. Cir. 1999) ....................................... 19, 21, 26, 28, 29, 31, 32

*Pharm. Mfg. Research Servs. v. FDA*,
    957 F.3d 254 (D.C. Cir. 2020) .................................................... 26, 34

*Qwest Corp. v. FCC*,
    689 F.3d 1214 (10th Cir. 2012)....................................................50

*Safari Club Int'l v. Salazar (In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig. - MDL No. 1993)*,
    709 F.3d 1 (D.C. Cir. 2013) ............................................. 20, 30, 31

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
    992 F.3d 1071 (D.C. Cir. 2021) ....................................................30

*Sierra Club v. U.S. DOT*,
    753 F.2d 120 (D.C. Cir. 1985) .............................................. 48, 49

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ..............................................................34

**Statutes**

5 U.S.C. § 706(2)(A)......................................................... 19, 20

16 U.S.C. § 1531(b) ............................................................4

16 U.S.C. § 1532(6) ............................................................4

16 U.S.C. § 1532(16) ..........................................................4

16 U.S.C. § 1532(20) ..........................................................30

16 U.S.C. § 1533(a)(1)...................................................... 4, 47

16 U.S.C. § 1533(b)(1)(A) ............................................ 2, 4, 21, 27, 32, 33, 36, 39, 53

16 U.S.C. § 1533(b)(3) ...................................................................................................6

16 U.S.C. § 1533(b)(3)(A) .........................................................................................5, 6

16 U.S.C. § 1533(b)(3)(B)(i) ..........................................................................................6

16 U.S.C. § 1533(b)(3)(B)(ii) .........................................................................................6

16 U.S.C. § 1533(b)(3)(B)(iii) ........................................................................................6

**Regulations**

50 C.F.R. § 424.11(a) ................................................ 2, 4, 21, 27, 31, 32, 33, 36, 44

50 C.F.R. § 424.11(d)(3) (2017) .....................................................................................6

50 C.F.R. § 424.14(a) .....................................................................................................5

**Other Authorities**

61 Fed. Reg. 4722 (Feb. 7, 1996) ..................................................................................4

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| Cattle Growers | Plaintiff-Appellant New Mexico Cattle Growers' Association |
| Delisting Petition | Cattle Growers' March 2015 petition to remove the southwestern willow flycatcher from the list of endangered species |
| Denial | United States Fish and Wildlife Service's final rule denying Cattle Growers' Delisting Petition |
| Department | United States Department of the Interior |
| ESA or Act | Endangered Species Act |
| NMFS | National Marine Fisheries Service |
| Service | Defendants-Appellees United States Fish and Wildlife Service; United States Department of the Interior; the Honorable Debra Haaland, in her official capacity as Secretary of the United States Department of the Interior; and the Honorable Martha Williams, in her official capacity as Director of the United States Fish and Wildlife Service |

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

This appeal concerns a claim by Appellant, the New Mexico Cattle Growers' Association ("Cattle Growers"), that the U.S. Fish and Wildlife Service ("Service") failed to adequately define the term "subspecies" when the Service denied a petition by Cattle Growers and others to remove the southwestern willow flycatcher from the list of endangered species and eliminate protections on the basis that the songbird is not a taxonomically valid subspecies ("Delisting Petition"). *See* Complaint ¶¶ 82–94, ECF No. 1.[1] In particular, Cattle Growers allege that the Service's decision to deny the Delisting Petition based on the agency's determination that the subspecies is taxonomically valid ("Denial") is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. §§ 1531–1544, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.

The issues on appeal are whether the Service's Denial was made in accordance with the standards set forth in the ESA and the ESA's implementing

---

[1] Cattle Growers have not appealed the district court's ruling on Cattle Growers' Third and Fourth Claims for Relief regarding the Service's alleged failure to consider relevant and available scientific evidence, including Zink (2017). *See* Complaint ¶¶ 95–107, ECF No. 1.

regulations at 50 C.F.R. § 424.11(a), and the principles of reasoned agency decisionmaking mandated in the APA. Specifically:

1.      Whether the Service properly relied on: a general scientific definition for "subspecies;" specific enumerated criteria; the ESA's statutory requirement to make listing decisions by relying "solely" on the best available science, 16 U.S.C. § 1533(b)(1)(A); and the ESA's implementing regulations, which require the Service to make taxonomic determinations relevant to listing decisions by relying on "standard taxonomic distinctions and the biological expertise of the Department [of the Interior ("Department")] and the scientific community concerning the relevant taxonomic group," 50 C.F.R. § 424.11(a), when it issued its Denial; and

2.      Whether the Service adequately explained its determination that the southwestern willow flycatcher is a valid subspecies, consistent with the agency's previous findings and the best available science showing that the southwestern subspecies is distinguishable from other willow flycatcher subspecies based on morphology, song type, habitat use, structure and placement of nests, ecological separation, and genetic distinctness.

## STATUTES AND REGULATIONS

All applicable statutes, rules, and regulations are set forth in the Addendum to Appellant's Opening Brief.

## STATEMENT OF THE CASE

### I.     Introduction

This case centers on Cattle Growers' ungrounded refrain that, for the Service's Denial to be lawful, the Service was required, and failed, to articulate a generally applicable definition of "subspecies" that is "falsifiable" when the Service determined that the southwestern willow flycatcher remains a taxonomically valid subspecies and denied the Delisting Petition on that basis. But the Service thoroughly explained the principles and criteria guiding its fact-based taxonomic determination that the southwestern willow flycatcher remains a valid subspecies in danger of extinction—consistent with the best available scientific information and data, including the agency's own expert analysis that considered the opinions of the Department and of the relevant scientific community. Thus, contrary to Cattle Growers' assertions, the Service's well-reasoned Denial complies with the ESA and its implementing regulations, is rationally explained with support in the record, and is therefore not arbitrary, capricious, an abuse of discretion, or otherwise in violation of law. Accordingly, the district court's ruling upholding the Denial should be affirmed.

### II.     The Endangered Species Act

Congress enacted the ESA to protect species in danger of extinction, including subspecies like the southwestern willow flycatcher, and to "provide a

means whereby the ecosystems upon which [such] species depend may be conserved." 16 U.S.C. § 1531(b).

The ESA requires the Service to determine whether a "species"—defined to include any "subspecies" and any "distinct population segment"[2] of a species, *id.* § 1532(16)—is "endangered" or "threatened," *id.* § 1533(a)(1), (*i.e.* to "list"). "In determining whether a particular taxon or population is a species," such that it is a listable entity for purposes of the Act, "the [Service] shall rely on standard taxonomic distinctions and the biological expertise of the Department and the scientific community concerning the relevant taxonomic group." 50 C.F.R. § 424.11(a). The Service must list a species as "endangered" if it determines that, based on one or more of five factors, the species "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

In making a listing determination, including whether a subspecies is valid taxonomically, the Service must rely "*solely*" on the "best scientific and commercial data available." *Id.* § 1533(b)(1)(A) (emphasis added). "Reliance upon the best available scientific data, as opposed to requiring absolute scientific

---

[2] As opposed to "species" and "subspecies," "the phrase 'distinct population segment' is not defined in the ESA, nor is this phrase commonly used in scientific discourse or recognized in formal taxonomic terms." *Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 79 (D.D.C. 2014) (cleaned up). Hence, the Service employs a separate analysis for distinct population segments, set forth in the *Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act*, 61 Fed. Reg. 4722 (Feb. 7, 1996).

certainty, 'is in keeping with congressional intent' that an agency 'take preventive measures *before* a species is 'conclusively' headed for extinction.'" *Ctr. for Biological Diversity v. Lohn*, 296 F. Supp. 2d 1223, 1236 (W.D. Wash. 2003) (quoting *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 679–80 (D.D.C. 1997)); *see also Am. Wildlands v. Norton*, 193 F. Supp. 2d 244, 251 (D.D.C. 2002) (same). In reviewing an ESA-listing decision, "when there is competing scientific data or expert opinions, a court should defer to the agency's technical expertise 'even if, as an original matter, a court might find contrary views more persuasive.'" *Lohn*, 296 F. Supp. 2d at 1236 (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

Congress recognized the importance of protecting subspecies when it passed the ESA in 1973, signaling "Congress's intent to target the Act's provisions where needed, rather than to require the woodenly undifferentiated treatment of all members of a taxonomic species." *Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585, 598 (D.C. Cir. 2017). This approach significantly expands the protections of earlier conservation laws, which focused solely on species-level protections. *See Humane Soc'y v. Jewell*, 76 F. Supp. 3d at 78.

Any interested person can petition the Service to list a species as endangered or threatened. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(a). Interested persons may also petition the Service to remove—or "delist"—species protected

under the ESA. *See* 16 U.S.C. § 1533(b)(3). For purposes of this case, delisting a species may be warranted if the Service determines that the original data relied upon—including data relevant to a taxonomic determination—when the species was listed, or the Service's interpretation of those data, were "in error." 50 C.F.R. § 424.11(d)(3) (2017).

Within 90 days of receiving such a petition, the Service must decide whether the petition presents "substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). If a petition receives a positive 90-day finding, the Service must determine within 12 months of receiving the petition whether the petitioned action is: (1) "warranted"; (2) "not warranted"; or (3) warranted but "precluded" by other proposals to list, delist, or reclassify the status of listed species. *Id.* § 1533(b)(3)(B)(i)–(iii).

## III.    Factual Background

### A.    The role of "subspecies" in avian taxonomy and conservation

Taxonomy is the basic hierarchical classification system for all life on earth: from Kingdom (*e.g.*, plants, animals, fungi) down to species (*e.g.*, white oak, bald eagle, shiitake). One "broadly accepted" scientific definition of a species is known as the "biological species concept," FWS015249, under which a species is a group of individuals that interbreed (or can interbreed) and are reproductively isolated from other groups, FWS011118; *see also* FWS015249.

6

Taxonomic classification extends below the species level to include subspecies. "A common way to distinguish organisms belonging to different subspecies (of the same species) is whether they are capable of interbreeding and producing fertile offspring, but usually do not interbreed in nature due to geographic isolation, sexual selection, or other factors." FWS000793. However, there is no widely accepted definition of "subspecies" among taxonomic experts. *See, e.g.*, FWS014315 (Haig *et al.* (2006) ("In an extensive literature review, we found no universally accepted subspecies definition within or across taxa.")).

Taxonomic classification is complex. It "attempts to inflict an unrealistic categorical scheme on the patterns produced by a disorderly, fundamentally noncategorical process." FWS016330. As one scientist has explained, "[w]hoever wants to hold firm rules, should give up taxonomic work. Nature is too disorderly for such a man." *Id.*

Conscious of this complexity, the Service recognizes that the best available science does not support a one-size-fits-all approach to classifying subspecies of birds, as "within the ornithological and taxonomic literature, there are no universally agreed upon criteria for delineating, defining, or diagnosing subspecies boundaries." FWS010894. Instead, the Service has found that "a multi-evidence criteria approach is most appropriate for distinguishing subspecies," particularly avian subspecies. FWS010895. This approach follows experts in avian taxonomy,

who have weighed multiple criteria—including morphology, behavior, geography, ecology, and genetics—when determining whether a group of birds is a distinct subspecies. *See, e.g.*, FWS014320.

**B.    The endangered southwestern willow flycatcher**



*Southwestern Willow Flycatcher © Jim Burns*

The southwestern willow flycatcher (*Empidonax traillii extimus*) is a small neotropical migrant songbird with a distinctive "fit-za-bew" song. The bird's unique song may be heard in the southwestern United States during its nesting season, typically between mid-May and September, and the bird migrates to Latin America in winter. Southwestern willow flycatchers display subtle differences in color and morphology from other willow flycatcher subspecies, as well as unique nesting habits. FWS000398. The southwestern willow flycatcher has a grayish-

8

green back, wings with two light wingbars, whitish throat, light grey-olive breast, and pale yellowish belly, FWS000396, and nests in dense vegetation along rivers and wetlands—areas that are historically rare and increasingly at risk across the bird's range through central and southern California, southern Nevada, southern Utah, southwestern Colorado, Arizona, New Mexico, and western Texas. FWS000398; FWS000632–634.

Throughout the Southwest, the songbird's fragile riverside nesting habitat has been decimated and remains at risk from many threats, including further habitat loss and fragmentation by harmful land use practices, such as livestock grazing. FWS000848–849. Due to these threats and significant population declines, the Service first listed the southwestern willow flycatcher in 1995 as an endangered species and set forth the criteria it used to distinguish the southwestern willow flycatcher from other flycatcher subspecies. FWS000396. The Service explained that the southwestern subspecies is "distinguishable from other willow flycatchers by color, being paler, and morphology (primarily wing formula) but not overall size," and that the bird's "song dialect" is unique among willow flycatchers. FWS000398. The Service also explained that subspecies of willow flycatchers are primarily distinguished in the field by differences in song dialect, with the southwestern subspecies singing a more protracted, slurred "fit-za-bew" song, as compared to another northern subspecies' crisp, sneezy "fitz-bew" call. *Id.*

The Service further noted that while all willow flycatcher subspecies prefer to nest in areas with surface water nearby, the southwestern subspecies "virtually always nests near surface water or saturated soil." *Id.*

Although the southwestern willow flycatcher's imperiled status has somewhat improved since its listing in 1995, the songbird remains endangered due to numerous threats. FWS000812. Widespread cattle grazing along southwestern rivers is a serious threat to the bird and its habitat, and excessive grazing practices have damaged riparian areas where the flycatcher nests. FWS000817–819; FWS000659–663. As livestock are allowed to trample and eat the vegetation along rivers, they eliminate and reduce the density of shrubs and plants that provide nesting, shelter, and foraging habitat for the flycatcher. FWS000841. Dams and diversions across the Southwest have further harmed the bird's nesting habitat by altering river flows and processes essential to healthy riparian vegetation. FWS000814. The rapid spread of the defoliating tamarisk leaf beetle—introduced in an early effort to control invasive tamarisk—has damaged shrubs where flycatchers nest. FWS000828. Other threats include nest predation, FWS000850, cowbird parasitism (whereby brown-headed cowbirds lay their eggs in flycatcher nests, and flycatchers incubate cowbird eggs and raise cowbird young in place of their own), FWS000816, and extreme drought and other harmful effects of climate change, FWS000862.

10

**C.    The Service's Denial of Cattle Growers' Delisting Petition**

**1.    Cattle Growers' Delisting Petition**

In 2015, Cattle Growers and other groups petitioned the Service to remove the southwestern willow flycatcher from the list of endangered species and eliminate protections. FWS000714–757. The Delisting Petition primarily relied on the opinions of Dr. Robert M. Zink in a 2015 commentary ("Zink (2015)") to support a theory that the southwestern willow flycatcher is not a valid subspecies and, thus, not listable under the ESA. *Id.* In essence, Dr. Zink argued that the southwestern willow flycatcher was not taxonomically distinct from other willow flycatcher subspecies. FWS020335–341.

**2.    The Service's species status review and comments**

The Service initiated a full status review of the species in March 2016 after finding that the Delisting Petition presented enough information to indicate that the petitioned action "*may* be warranted" based on the taxonomic information provided. FWS000782 (emphasis added). The standard for a "may be warranted" determination, however, "is not a rigorous one[,]" *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 106 (D.D.C. 2018) (collecting cases), and the Service was clear that its initial "may be warranted" finding was not a guarantee that, after a full review of the species' status, the agency would find that delisting the southwestern willow flycatcher is warranted, FWS000773.

11

As part of its review, the Service solicited information relevant to the southwestern willow flycatcher's status as a subspecies protected by the ESA. FWS000782. In response, the Service received a published peer-reviewed study, Theimer *et al.* (2016), that provided additional analyses supporting recognition of the southwestern willow flycatcher as a subspecies, including an evaluation of the methods and opinions of Zink (2015). FWS000791. Theimer *et al.* (2016) emphasized that, in contrast to Zink (2015)'s assertion that Paxton *et al.* (2007) incorrectly graphed genetic data "identify[ing] differences among flycatcher subspecies," FWS000788, it was Zink (2015) that graphed the data incorrectly, FWS000801. Based on a new analysis with correct data, Theimer *et al.* (2016) found strong support for continuing to recognize the southwestern subspecies based on "a break in haplotype frequency roughly concordant with the boundary … as currently recognized" by the Service. *Id.*

The Service subsequently received three additional comments from Dr. Zink: one commenting on Theimer *et al.* (2016), another informing the Service that a response to Theimer *et al.* (2016) was "in press" at the Open Ornithology Journal, and a third indicating that Zink (2017)'s commentary on Theimer *et al.* (2016) had been published. FWS000791.

### 3.     The Service's Denial

After a full scientific review of the species' status and having considered all comments received, in December 2017, the Service issued its Denial finding that the best available science showed that delisting the southwestern willow flycatcher was not warranted. FWS000785–876. In denying Cattle Growers' Delisting Petition, the Service reviewed "reports and literature (including more recent quantitative data), the professional opinion of a broad group of ornithological organizations, and additional analyses of recent flycatcher studies evaluating diagnostic subspecies characteristics." FWS000807. In doing so, the Service "provided information on how a subspecies is defined under the [ESA] along with the taxonomic history of the southwestern willow flycatcher." FWS000792.

In the Denial, the Service first set forth a "common" scientific definition of "subspecies," explaining that a "common way to distinguish organisms belonging to different subspecies (of the same species) is whether they are capable of interbreeding and producing fertile offspring, but usually do not interbreed in nature due to geographical isolation, sexual selection, or other factors." FWS000793. Noting the controversy over the delineation of "subspecies," the Service explained that the subspecies category "survives in almost all modern classifications of birds," has persisted "since the mid-1800s" as described by Remsen (2010), and is driven by a perception that a species "can include within it

13

named subpopulations to identify non-clinal geographic variation (a cline is a

gradient of morphological or physiological change in a group of related organisms

usually along a line of environmental or geographic transition)." *Id.* The Service

acknowledged that some systematists recognize subspecies "only if there is a

narrow geographic region of rapid change in character (a step cline)," but

explained that a "zone of intergradation between subspecies that come into contact

with one another geographically can be expected." *Id.* The Service explained why

this is true for the southwestern willow flycatcher, as there is a "region of genetic

overlap" between the northern and southwestern subspecies, but "the region is

sparsely populated with breeding flycatchers, and therefore only minimal

information is available that would help narrow down the location of a boundary."

FWS000787.[3]

     The Service then proceeded to comprehensively explain the relevant factors

and criteria it relied on, based on extensive scientific data and literature, to

determine that the southwestern willow flycatcher remains a taxonomically valid

subspecies. The Service explained in detail how the best available science

---

[3] The Service also noted that Theimer *et al*. (2016) "provided compelling
information about step-clines associated with willow flycatcher subspecies
genetics and morphology[,]" demonstrating "a marked discontinuity in quantitative
genetic and morphological features that generally coincides with the current
described willow flycatcher subspecies boundary and that supports subspecies
classification." FWS000807–808.

concerning morphology, biology, genetics, range, and song dialect, and the general consensus of avian experts, all support the Service's conclusion that the southwestern willow flycatcher satisfies the relevant criteria to distinguish the subspecies from other willow flycatchers subspecies. FWS000793–808.

After describing the subspecies' taxonomic history that supported its listing in 1995, FWS000793–797, the Service responded to the specific contentions of the Delisting Petition, FWS000797–799, *see also* FWS000811–822, and summarized the post-listing science that supports the continued validity of the southwestern subspecies, FWS000799–807. In doing so, the Service explained that Zink (2017) and Theimer *et al.* (2016) presented no new data and ultimately did not change the Service's conclusion that the southwestern willow flycatcher remains a valid subspecies. FWS000791–792; *see also* FWS000807–808 (noting that the Service examined "the issues raised in the petition (PLF 2015) and Zink (2015, 2016 [sic])" but found that they did not present sufficient scientific information "to restructure the taxonomy … and negate recognition of the southwestern subspecies"). The Service therefore concluded that, based on the best available science, the southwestern willow flycatcher remained a valid subspecies. FWS000807–808.

After affirming the southwestern willow flycatcher's taxonomic validity, the Service's Denial thoroughly analyzed the five factors warranting the songbird's

continued protection under the ESA. FWS000808–869. The Service found that improper livestock grazing remains a serious ongoing threat such that "flycatcher recovery would be most assured, and in the shortest time, with total exclusion of livestock grazing from riparian areas" necessary for recovery. FWS000841–843. The Service additionally explained that harm from agriculture, urbanization, and recreation are significant persistent threats to the southwestern willow flycatcher across its breeding range, and that water use and river management "continue to be high-level stressors for the flycatcher and its habitat." FWS000871. The Service further found that the spread of the tamarisk leaf beetle is an "increasing" and "significant current and future threat" to the southwestern willow flycatcher and its habitat, and a hindrance to the bird's recovery. FWS000832; FWS000872. Also, the Service found that the threats from wildland fire and fire management, excessive drought, and climate change are increasing. FWS000872–873. The Service determined that without ESA protections, "existing Federal … and state regulations are inadequate" to protect the subspecies. FWS000820. Based on its analysis and the best scientific data and information available, the Service ultimately concluded that delisting the southwestern willow flycatcher is not warranted because it remains a valid subspecies in danger of extinction. FWS000870.

On December 29, 2017, the Service published in the Federal Register its notice of decision finding that delisting the southwestern willow flycatcher is not warranted, incorporating by reference the Service's detailed discussion of the basis for its finding set forth in the Denial. FWS000879.

## IV.    Procedural History

On December 13, 2021, Cattle Growers filed a lawsuit in the U.S. District Court for the District of Columbia challenging the Service's Denial. *See* Complaint, ECF No. 1. Cattle Growers claimed that the Service violated the ESA and/or the APA because the Denial allegedly did not "articulate a standard or definition for what constitutes an avian subspecies." *Id.* ¶¶ 88, 94. Cattle Growers further alleged that the Service purportedly "refused" to consider Zink (2017), despite the agency expressly finding that Zink (2017) did not present new data or information sufficient to change its decision. *Id.* ¶¶ 98–99. Cattle Growers requested that the district court vacate the Denial and remand it to the Service for reconsideration. *Id.* ¶¶ 24–25.

On May 6, 2022, the district court granted a motion to intervene submitted by the Center for Biological Diversity ("Center") and Maricopa Audubon Society. Min. Order (May 6, 2022). The parties filed cross-motions for summary judgment, ECF Nos. 25–33, and a hearing was held on October 26, 2023.

17

On February 28, 2024, the district court entered a memorandum opinion and order denying Cattle Growers' motion for summary judgment and granting the Service's and the Center and Maricopa Audubon Society's cross-motions for summary judgment on all claims. Mem. Op. 19–21, ECF No. 42. In its memorandum opinion, the district court found that the Service appropriately relied on taxonomists' definition of subspecies. *Id.* at 18. Specifically, the district court noted that the Service had "confirmed that taxonomists classify subspecies by considering whether the animals 'are capable of interbreeding and producing fertile offspring, but usually do not interbreed in nature due to geographic isolation, sexual selection, or other factors[,]'" *id.* at 19 (quoting FWS000793), and that the Service had "surveyed four specific methods for classifying a bird subspecies generally: genetic sampling, ecological niche modeling, song comparison, and plumage coloration analysis[,]" *id.* (citing FWS000800–805). Holding that "[n]othing in the ESA or APA required the Service to pick a single bright-line definition to apply woodenly across its listing decisions[,]" *id.*, the district court found that a "reasonable individual could understand the Service's guiding principles[,]" and that the Service had followed the best available science when issuing its Denial, *id.* at 20–21.

The district court also dismissed Cattle Growers' contention that the Service was required to produce a "falsifiable" definition. *Id.* at 21–23. In doing so, the

18

court held that "[a]n agency can assess the best available scientific evidence in its totality against a clear yet unfalsifiable standard—here the methods taxonomists use to classify bird species." *Id.* at 21. Finding that the case in front of it was a "far cry from the vague requirement of 'significant scientific agreement'" at issue in the D.C. Circuit's opinion in *Pearson v. Shalala*, 164 F.3d 650 (D.C. Cir. 1999), the district court found that the Service had "assessed four methods taxonomists use to classify willow flycatcher subspecies[,]" and "applied its expertise to explain which studies constituted the best scientific evidence and why those studies supported subspecies classification for a particular bird." Mem. Op. 22, ECF No. 42 (citing FWS000800–808).[4]

## STANDARD OF REVIEW

Because the ESA lacks its own standard of review, courts apply the APA's standard of review to ESA listing decisions. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997 (D.C. Cir. 2008). In relevant part, this standard specifies that a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Thus, courts "will uphold an agency action unless [it is found] to be 'arbitrary, capricious, an abuse of

---

[4] Regarding an issue not on appeal here, the district court also found that the Service had adequately analyzed Zink (2017). Mem. Op. 23–24, ECF No. 42.

discretion, or otherwise not in accordance with law.'" *Safari Club Int'l v. Salazar (In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig. - MDL No. 1993)*, 709 F.3d 1, 3 (D.C. Cir. 2013) ("*In re Polar Bear*") (quoting 5 U.S.C. § 706(2)(A)).

Under this standard, a reviewing court must determine whether the agency "considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made." *Keating v. FERC*, 569 F.3d 427, 433 (D.C. Cir. 2009). An agency's decision is arbitrary and capricious if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.* Deference is especially warranted where, as here, the decision at issue "requires a high level of technical expertise." *Marsh*, 490 U.S. at 377.

## SUMMARY OF ARGUMENT

The Service lawfully denied Cattle Growers' Delisting Petition, providing a reasoned, scientifically grounded decision consistent with the ESA and its implementing regulations and the APA's principles of reasoned decisionmaking.

Cattle Growers first challenge the Denial on the grounds that the Service's taxonomic determination for the southwestern willow flycatcher was arbitrary and capricious because it lacked a "falsifiable" standard. This argument is unsupported by the Service's decision here, as well as the plain terms of the ESA and its implementing regulations. The ESA requires that listing decisions rely solely on the best available science, 16 U.S.C. § 1533(b)(1)(A), and the ESA's implementing regulations require taxonomic determinations to rely on "standard taxonomic distinctions and the biological expertise of the Department and the scientific community concerning the relevant taxonomic group," 50 C.F.R. § 424.11(a). Then, under the APA's arbitrary and capricious standard, an agency's determination will be upheld if it is "possible for the regulated class to perceive the principles which are guiding agency action[,]" *Pearson*, 164 F.3d at 661, and the agency explains how those principles resulted in the action taken, *PDK Labs. v. U.S. DEA*, 438 F.3d 1184, 1194–95 (D.C. Cir. 2006).

The Service did exactly that in its Denial, providing a common scientific definition of "subspecies," explaining the taxonomic criteria the agency relied on

21

to distinguish the southwestern subspecies from other willow flycatcher

subspecies, and ultimately determining that the subspecies is valid based on the

best available science and the Service's expertise in alignment with over 70 years

of ornithological research and the consensus of avian taxonomists. The Service's

approach, thus, fully complies with the APA and ESA.

Cattle Growers next misrepresent the Service's thorough approach, first by

suggesting that it relied solely on a "majority opinion" of scientific studies. In fact,

the Service's taxonomic determination was based on its careful review of decades

of scientific research, not merely a tally of opinions. The Service considered

scientifically supported, multi-factor criteria—morphological differences, song

dialect, nesting habitat preferences, and genetic data—and used established

taxonomic methods to support the agency's reliance on these criteria when

determining that the southwestern willow flycatcher is a valid subspecies.

Cattle Growers next challenge the Service's use of "non-clinal geographic

variation" to distinguish subspecies, arguing that this method is not "falsifiable"

and necessarily leads to an arbitrary conclusion. The Service's Denial, however,

explained that the southwestern willow flycatcher is a valid subspecies because the

best available science shows that it can be distinguished from other flycatcher

subspecies with a stable boundary between subspecies, despite limited overlap.

When doing so, the Service considered, but rejected, the competing view presented

in the Delisting Petition by Dr. Zink—Cattle Growers' preferred scientist—that there is no discernable line of demarcation between willow flycatcher subspecies. Thus, it is not that the Service's approach was not "falsifiable," as Cattle Growers' Delisting Petition attempted to present contrary evidence refuting the criteria the Service relied on when making its taxonomic determination, but, rather, that Cattle Growers disagree with the outcome, attempting to recast their fact-based arguments as legal ones. However, in such a dispute, involving "primarily issues of fact[,]" the analysis of which "requires a high level of technical expertise," courts are required to defer to "the informed discretion of the responsible federal agencies." *Marsh*, 490 U.S. at 377 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)).

Cattle Growers also suggest potential constitutional issues, claiming that the Service's taxonomic determination violates the nondelegation doctrine and raises due process concerns. However, Cattle Growers' nondelegation argument is waived because Cattle Growers have raised it for the first time on appeal. Regardless, Cattle Growers' constitutional arguments are based on speculation, rather than what the agency has done, and fail to demonstrate any credible constitutional violation. Even if Cattle Growers had properly raised a nondelegation claim below, their argument misapplies the principle, focusing not on what authority Congress has delegated to the agency but, rather, on the agency's

decisionmaking. Here, Congress has provided sufficiently clear guidelines in the ESA for the Service's listing decisions, and Cattle Growers fail to cite any case where nondelegation has invalidated an agency decision. Cattle Growers' due process concerns are similarly unfounded, as the southwestern willow flycatcher has been protected as endangered for decades, with no evidence of confusion or arbitrary enforcement affecting the public. Cattle Growers' hypothetical issues regarding the identification of subspecies lack credibility, especially as they have not demonstrated that any of their members' operations are near the subspecies' boundary. Overall, Cattle Growers do not present a credible constitutional challenge to the Service's taxonomic determination regarding the southwestern willow flycatcher.

In the end, this is a routine challenge to agency action evaluated under the arbitrary and capricious standard as set forth in the APA. The Service's 91-page Denial was based on sound scientific reasoning and adhered to the requirements of the APA and ESA. Cattle Growers' challenge to the Service's Denial, both on the merits and on speculative constitutional grounds, is without legal or factual foundation. Accordingly, the decision of the district court upholding the Service's Denial should be affirmed.

## ARGUMENT

**I.   The Service's Denial explained the principles and criteria guiding the agency's determination that the southwestern willow flycatcher is a valid subspecies.**

Cattle Growers allege that the Service was required, and failed, to articulate a definition of "subspecies" capable of "falsification" and, therefore, failed to provide a non-arbitrary standard governing the Service's analysis of the southwestern willow flycatcher's taxonomic status as a subspecies. Appellant's Br. 32–38. In essence, Cattle Growers assert that without such a "falsifiable" standard, the Service is free to reach any outcome it desires by picking and choosing which criteria it would like to apply.

Cattle Growers contend that the requirement to "articulat[e] a standard or measure to explain [an agency's] decision," stems from the arbitrary and capricious standard for reasonable agency decisionmaking that the Supreme Court set forth in *State Farm*, 463 U.S. at 43. Appellant's Br. 32. But that case includes no such requirement; as long as the agency's analytical framework is reasonably explained and supported by the record, it passes muster under the arbitrary and capricious standard. *State Farm*, 463 U.S. at 43.

And the D.C. Circuit has been crystal-clear: an agency is not "required to define [a statutory] term in its initial general regulation—or indeed … obliged to issue a comprehensive definition all at once[,] … as long as it is "possible for the

regulated class to perceive the principles which are guiding agency action[,]" *Pearson*, 164 F.3d at 661, and the agency explains how those principles resulted in the action taken, *PDK Labs.*, 438 F.3d at 1194–95 ("[A]n agency is not necessarily required to define an open-ended term in its initial general regulation—or indeed … obliged to issue a comprehensive definition all at once.") (cleaned up).

That is precisely what the Service has done here, consistently applying and explaining the criteria it used in its taxonomic determination that the southwestern willow flycatcher is a valid subspecies. In doing so, the Service provided the needed "definitional content" for a reasoned decision. *Pearson*, 164 F.3d at 660. The Service, in fact, provided a "common" scientific definition of a subspecies, stating that a "common way to distinguish organisms belonging to different subspecies (of the same species) is whether they are capable of interbreeding and producing fertile offspring, but usually do not interbreed in nature due to geographical isolation, sexual selection, or other factors." FWS000793. The Service's Denial then set forth the generally accepted standards and criteria the agency employed when determining that the southwestern willow flycatcher satisfies that definition and rationally explained its taxonomic determination with support from the record. *See infra* at I.B. The APA requires nothing more. *See, e.g.*, *Pharm. Mfg. Research Servs. v. FDA*, 957 F.3d 254, 265 (D.C. Cir. 2020) (upholding an agency's decision that "examined the material factors, considered

26

the record as a whole, and provided a reasonable explanation for its decision," and explaining that "[m]eaningful review of the agency's actions does not require [the court] to step into [the agency]'s shoes and reassess its scientific judgments—a role that [the court is] ill-equipped to play under the guise of the APA's arbitrary and capricious standard") (cleaned up).

Contrary to Cattle Growers' claim, the Service's approach to taxonomic determinations does not render the Service's discretion unbounded. Rather, in addition to the APA's basic requirement for reasonable explanation—easily satisfied here in the agency's 91-page finding—the Service must adhere to the ESA's statutory commandment that such a determination be based solely on the best available science, 16 U.S.C. § 1533(b)(1)(A), and the Act's implementing regulations that require the Service to rely "on standard taxonomic distinctions and the biological expertise of the Department and the scientific community concerning the relevant taxonomic group[,]" when "determining whether a particular taxon or population is a species for the purposes of the Act[.]" 50 C.F.R. § 424.11(a). These standards allow for meaningful judicial review, as demonstrated by at least one previous case overturning a taxonomic determination for failing to comply with them. *See Lohn*, 296 F. Supp. 2d at 1237–40 (agreeing with plaintiffs that the National Marine Fisheries Service ("NMFS") had "relied upon a definition

of the orca species that f[ell] below the best available scientific information standard").

### A. The Service is not required to promulgate an independent, generally applicable definition or "falsifiable" standard for "subspecies."

Cattle Growers insist that supplying a falsifiable standard is inherently part of any "reasoned" administrative decision. *See* Appellant's Br. 28. But neither the plain language of the ESA nor the APA requires the Service to promulgate such a standard independent of the agency's fact-specific well-reasoned determination that the southwestern willow flycatcher, or any subspecies, meets the generally accepted definition of a subspecies. And none of the cases Cattle Growers cite require an agency to promulgate a falsifiable standard for a statutory term independent from the agency's case-by-case determination, as long as the agency rationally explains its reasoning with adequate support in the record.

Indeed, in the primary case on which Cattle Growers rely, this court held that an agency is not "obliged to issue a comprehensive definition all at once." *Pearson*, 164 F.3d at 661. In *Pearson*, this court found that the Food and Drug Administration had failed to "giv[e] some definitional content to the phrase 'significant scientific agreement'" because the "agency … declare[d]—*without explanation*—that a proposed course of private action [wa]s not approved." *Id.* at 660 (emphasis added). The court was careful to explain, however, that the agency

28

was not "necessarily required to define the term in its initial general regulation—or indeed … obliged to issue a comprehensive definition all at once." *Id.* at 661. Instead, an "agency is entitled to proceed case by case or, more accurately, sub-regulation by subregulation," if it is "possible for the regulated class to perceive the principles which are guiding agency action." *Id.*

This court further expanded upon when an agency has engaged in reasoned decisionmaking despite not setting forth a detailed definition of a statutory term in *PDK Laboratories*. There, this court explained that an agency is not required to provide a "clear 'line of demarcation' to define an open-ended term." 438 F.3d at 1195 (quoting *Chippewa & Flambeau Improvement Co. v. FERC*, 325 F.3d 353, 359 (D.C. Cir. 2003) (explaining that FERC did not need to announce a specific threshold for reservoir licensing, despite the gray area between licensing decisions)). Instead, an agency may provide the "definitional content" necessary to "flesh[] out the contours of vague statutory terms … case-by-case" in a manner that demonstrates what factual circumstances are and are not encompassed by the statutory language. *PDK Labs.*, 438 F.3d at 1194 (quoting *Pearson*, 164 F.3d at 660).[5] Such a "totality of the circumstances" or "all-things-considered" approach is

---

[5] Indeed, Cattle Growers in the district court admitted that the Service is not precluded from "developing its taxonomic rules through individual listing determinations, so long as the resulting standards were applied consistently and any variation were justified by legitimate scientific principle." Pls.' Reply & Opp. to Mot. Summ. J. 13, ECF No. 30.

appropriate when an agency is applying a statutory term to a fact-based
determination that confers broad discretionary authority. *Id.* at 1195.

Similarly, in *In re Polar Bear*, this court considered the Service's listing of
the polar bear as a threatened species despite the agency not providing an
independent definition of "likely" when considering whether the polar bear was
"*likely* to become an endangered species within the foreseeable future throughout
all or a significant portion of its range." *In re Polar Bear*, 709 F.3d at 3 (quoting 16
U.S.C. § 1532(20) (emphasis added)). There, the case focused on whether the
Service's failure to offer a definitive standard for the statutory term "likely"
"impede[d] [the panel's] ability to review the agency's decisionmaking process."
*Id.* This court found that the appellants had "not presented [the court] with a single
case in which a court has struck down an ESA listing decision because the agency
declined to separate out and specially define the term 'likely.'" *Id.* at 15. Absent a
statutory definition, this court found that the Service was "free to rely on common
English usage without adopting specialized definitions." *Id.* What mattered was
whether the agency provided a reasoned determination supporting its conclusion.
*Id.*; *see also Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d
1071, 1093 (D.C. Cir. 2021) ("The point of administrative review is not to settle
the scientific debate, but to ensure that the Service 'explain[ed] the assumptions

30

and methodology used in preparing the model[.]'" (quoting *In re Polar Bear*, 709 F.3d at 13)).

Thus, it is clear that the Service was not *required* "to issue a comprehensive definition all at once[,]" *Pearson*, 164 F.3d at 661, nor required to provide a "clear 'line of demarcation' to define an open-ended term." *PDK Labs.*, 438 F.3d at 1195. And yet the Service *did* provide a common scientific definition of "subspecies," FWS000793—which Cattle Growers do not dispute—and set forth the various criteria upon which it relied to determine that the southwestern willow flycatcher is a valid subspecies, FWS000800–808. In doing so, it provided the "definitional content" necessary to "flesh[] out the contours of vague statutory terms … case-by-case" in a manner that demonstrates what factual circumstances are and are not encompassed by the statutory language. *PDK Labs.*, 438 F.3d at 1194 (quoting *Pearson*, 164 F.3d at 660).

**B.**    **The Service provided the criteria guiding its determination and explained why the southwestern willow flycatcher is a valid subspecies according to those criteria and the best available science.**

Despite Cattle Growers' contentions to the contrary, the Service did not simply rely on "*unexplained* notions of the 'biological expertise of the Department and the scientific community.'" Appellant's Br. 34 (quoting 50 C.F.R. § 424.11(a)). Instead, the Service articulated the criteria that experts in avian taxonomy have developed and used to determine that the southwestern willow flycatcher is a valid

31

subspecies and explained why the agency found those criteria compelling, despite Cattle Growers' contentions to the contrary in their Delisting Petition. FWS000793–808. In doing so, the Service acted in accordance with the ESA's mandate that its listing decisions be based solely on the best available science, 16 U.S.C. § 1533(b)(1)(A), and with ESA regulations that require the Service to "rely on standard taxonomic distinctions and the biological expertise of the Department and the scientific community concerning the relevant taxonomic group," 50 C.F.R. § 424.11(a).

The facts of this case are, thus, a far cry from those in *Pearson*, where the agency made its decision "without explanation" and withheld from the regulated community the reasoning behind its decisionmaking process. 164 F.3d at 660–61. Those facts would be more applicable if the Service, in response to the Delisting Petition, had concluded simply that it upheld its taxonomic determination on the basis of its "biological expertise of the Department and the scientific community" and provided no further explanation.

Here, however, the Service provided a common scientific definition of subspecies, explained the criteria the Service applied to determine that the southwestern willow flycatcher is a valid subspecies, and went into detail on why the best available science showed how these criteria set the southwestern willow flycatcher apart from other flycatcher subspecies. FWS000793–808. The Service's

32

explication of the criteria supporting its taxonomic determination began when the Service listed the songbird in 1995 and determined that the subspecies is valid based on numerous studies recognizing it as such due to differences between willow flycatcher subspecies in morphology (primarily color variation and wing feather lengths), biology, genetics, range, and song dialect. FWS000396–398. Then, in its Denial, the Service expanded on its prior reasoning—after providing a common scientific definition for "subspecies," FWS000793—and comprehensively described the criteria and relevant methodologies, based on extensive scientific literature, that the Service relied on to once again conclude that the southwestern willow flycatcher is a valid subspecies. FWS000793–808. In line with the 1995 listing, FWS000398, the Denial relied on the best available science—affirming the southwestern subspecies based on differences between willow flycatcher subspecies in morphology, biology, genetics, range, and song dialect—as well as the general consensus of avian experts, to verify the southwestern willow flycatcher's status as a valid subspecies, FWS000793–808, in line with the ESA and its implementing regulations requirements.[6] *See* 16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. § 424.11(a). Nothing more is required. *See, e.g.*, *Pharm.*

---

[6] The Service thus did not rely on the "best available science" as an independent standard for its subspecies determination, *see* Appellant's Br. 50–52, but instead found that the best available science supported its conclusion that the southwestern willow flycatcher meets the common definition of subspecies and is distinct from other willow flycatcher subspecies. FWS000800–808.

*Mfg. Research Servs.*, 957 F.3d at 265 (upholding an agency's decision that "examined the material factors, considered the record as a whole, and provided a reasonable explanation for its decision").

### C.   By providing and adhering to these principles, the Service did not engage in standardless rulemaking incapable of "falsification."

Cattle Growers strenuously argue that the Service must set forth a "falsifiable" standard without ever illuminating precisely what that means. Appellant's Br. 35. If it means that an agency must articulate its decision-making criteria so that a court may discern what they are and whether they are supported by the record in a particular case, that is simply a reformulation of basic APA principles using different verbiage, and the Service did so here. If it requires more, it not only has no basis in the APA, *State Farm*, or the ESA, but it "fundamentally misconceives the nature of the standard for judicial review of an agency rule" by asking this Court to impose obligations on the Service beyond those required by Congress. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 547 (1978).

In any event, the Service's well-reasoned Denial withstands Cattle Growers' specific critiques. First, Cattle Growers argue that the Service's Denial leaves "the regulated public" with "no way to 'perceive the principles which are guiding agency action." Appellants' Br. 36. But Cattle Growers clearly understood the principles guiding the Service's taxonomic determination because their Delisting

34

Petition addressed the very criteria on which the Service has consistently relied to determine that the subspecies is valid—asserting "[n]either molecular, ecological, vocal, nor morphological data support the [flycatcher] as a subspecies[.]" FWS000720. As such, Cattle Growers have no basis on which to argue that they (the regulated public) were "prevented from developing the necessary data to support a delisting petition[.]" Appellants' Br. 37.

Additionally, having set forth the criteria it was applying, the Service is not able to "inevitably produce an affirmative subspecies conclusion." Appellants' Br. 31, 35. Rather, the Service must explain, as it did here, how the best available science supports the Service's determination regarding each of the criteria.

Because of this, the Service's Denial is not "immune from arbitrary and capricious review." Appellants' Br. 36. Rather, as the district court did below, courts can assess whether the Service set forth the criteria by which it made a determination and adequately explained the reasoning behind its conclusion in line with those criteria. *See, e.g., Am. Wildlands v. Kempthorne*, 478 F. Supp. 2d 92, 100 (D.D.C. 2007) (upholding a subspecies determination based primarily on morphology because Service "considered the question of [the subspecies'] taxonomy in depth and had several sources of evidence supporting its morphology-based approach to classifying [the subspecies'] populations")).

Consequently, the Service's taxonomic determinations, including the Denial, are not insulated from judicial scrutiny. For instance, a court overturned a taxonomic determination because it was not in accordance with the best available science, 16 U.S.C. § 1533(b)(1)(A), or the consensus of the scientific community concerning the relevant taxonomic group, 50 C.F.R. § 424.11(a). In *Center for Biological Diversity v. Lohn*, the Center successfully argued that NMFS erred when it found that Southern Resident orca whales did not warrant listing because NMFS had "relied upon a definition of the orca species that f[ell] below the best available scientific information standard." 296 F. Supp. 2d at 1227. In that case, the Center argued that NMFS's not-warranted decision was based on an "outdated and discredited global *Orcinus orca* taxon," when more recent science supported breaking the global taxon into several smaller taxa. *Id.* at 1236–37. The court found the record "replete with compelling evidence" that the global taxon was inaccurate and contrary to the best available science. *Id.* at 1237. In doing so, the court was persuaded by the opinions of the "biological review team" composed of "eleven NMFS scientists with expertise in conservation biology, genetics, risk assessment, risk modeling, toxicology, and contaminants," *id.* at 1230, which "concluded that the global taxon is incorrect and that resident and transient [orcas] belong in two different taxa," *id.* at 1237. The court therefore found that the ESA regulations, 50 C.F.R. § 424.11(a), supported the Center's argument that NMFS's adoption of the

"standard taxonomic distinction [was] inaccurate." *Lohn,* 296 F. Supp. 2d at 1238. If the regulations at 50 C.F.R. § 424.11(a) or the ESA's best available science requirement imposed no standards, leaving the Service with unbridled discretion to arrive at whatever outcome it preferred, the Center could not have prevailed on this claim.

Cattle Growers' problem here is therefore not that there is no meaningful way for a court to review the rationality of the Service's finding that the best available science and general consensus of avian taxonomists support its subspecies determination for the southwestern willow flycatcher. Rather, their problem is that the Service did not find that the views of Cattle Growers' preferred (outlier) expert constituted the best available science given the voluminous information in the record that supported the southwestern willow flycatcher's status as a subspecies and refuted the specific points raised by Cattle Growers' preferred scientist. Regardless, a difference in scientific opinions alone is not a basis for rejecting the Denial because of the "deference traditionally given to an agency when reviewing a scientific analysis within its area of expertise." *Appalachian Power Co. v. EPA*, 135 F.3d 791, 802 (D.C. Cir. 1998); *see also Marsh*, 490 U.S. at 376–77, 377 n.22 (explaining that a dispute may "involve primarily issues of fact" that "implicate[] substantial agency expertise" although "*some* legal standard is involved").

37

For an expert agency like the Service, "[i]t is not infrequent that the available data does not settle a regulatory issue and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion." *State Farm*, 463 U.S. at 52. A court's role is not to analyze whether the agency's conclusion satisfies Cattle Growers' preferred approach of "falsification" but to look at that the Service's conclusion and determine if it is supported by reasoned analysis. *Id.* at 57. The district court in this case did just that. Recognizing that "[t]he Service is not a lexicographer," the district court held that the best available science standard requires an agency to look at the evidence in its totality. Mem. Op. at 19–21. The district court concluded that the Service's reliance on four criteria of taxonomic classification was an appropriate exercise of its expertise. *Id.* at 22.

Finally, Cattle Growers fail to acknowledge the practical issues inherent in their insistence on a one-size-fits-all approach to characterizing subspecies. As evidenced by the variety of criteria applicable to the flycatcher alone— morphology, biology, genetics, range, and song characteristics—the appropriate methodology on which the Service may base a taxonomic determination relevant to a listing decision may depend on both the specific criteria relevant to the taxon at issue and the available scientific data pertaining to those criteria. *See Bldg. Indus. Ass'n v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001) (explaining that the Service

"must utilize the 'best scientific … data available,' not the best scientific data possible" (quoting 16 U.S.C. § 1533(b)(1)(A))).

For instance, in *Alabama-Tombigbee Rivers Coalition v. Kempthorne*, the Eleventh Circuit recognized that while differences in one gene may "often correlate with speciation in vertebrates, … that gene [may] not serve as an effective, species-differentiating genetic marker in [every] case." 477 F.3d 1250, 1258 (11th Cir. 2007). In that case, the court deferred to the agency's decision "to examine the entirety of the taxonomic record, rather than ending its analysis with the DNA results." *Id.*

Ultimately, in upholding the southwestern willow flycatcher's taxonomic status, the Service relied on its own biological expertise, that of the Department, and the relevant scientific community, and followed the scientifically preferred "multi-evidence criteria approach … for distinguishing [avian] subspecies," FWS010895, to affirm the subspecies' validity, FWS000807. Thus, the Denial lawfully complied with the APA's requirements for reasoned decisionmaking, the ESA's requirement to rely solely on the best available science, and the ESA's implementing regulations' requirement to rely on standard taxonomic distinctions and the biological expertise of the Department and the scientific community concerning the relevant taxonomic group.

## II.    Cattle Growers misrepresent the Service's well-reasoned taxonomic determination that the southwestern willow flycatcher is a valid subspecies in an attempt to relitigate the science.

Cattle Growers next argue that the standards and criteria the Service relied upon were no standards at all because they allegedly failed to adhere to the APA's requirements for reasoned decisionmaking. Appellants' Br. 38–52. But Cattle Growers' critiques misrepresent what the Service did in a veiled attempt to relitigate the science the Service relied on to support its Denial. Ultimately, while Cattle Growers attempt to cast their arguments as legal ones, their "dispute involves primarily issues of fact[,]" the analysis of which "requires a high level of technical expertise," requiring deference to "the informed discretion of the responsible federal agencies." *Marsh*, 490 U.S. at 377 (quoting *Kleppe*, 427 U.S. at 412).

### A.    The Service's taxonomic decision did not merely accept the majority opinion but appropriately considered and explained the underlying best available science supporting its Denial.

Cattle Growers wrongly suggest that the Service followed an arbitrary "unvarnished 'majority opinion'" standard. Appellants' Br. 39–40. But the Service did not simply "count[] academic heads" and end its analysis after finding that the majority of studies supported recognizing the subspecies as valid, as Cattle Growers insinuate. *Id.* at 39.

40

Instead, when the Service listed the southwestern willow flycatcher in 1995, it noted that all but one author found the subspecies to be valid. FWS000795–796 (citing 17 authorities supporting the subspecies' taxonomic status and noting that one study contrasted with the majority opinion based on the author's "reluctance to recognize willow flycatcher subspecies"). But, as noted above, *see supra* at 32–33, the Service explained that these studies formed the scientific basis for the criteria upon which the Service based its determination that the southwestern subspecies is valid—*i.e.*, because it is morphologically distinct, has a unique song dialect, and specific nesting habitat preferences. FWS000398.

Then, in its Denial, the Service gave a common scientific definition of subspecies, FWS000793, described the subspecies' taxonomic history supporting its listing in 1995, FWS000793–797, explained its reliance on the best available science regarding the southwestern willow flycatcher's classification as a subspecies between 1948 and the subspecies' listing in 1995, FWS000793–794, responded to the specific contentions of the Delisting Petition, FWS000797–799, *see also* FWS000811–822, and summarized the post-listing science that supports the continued validity of the southwestern subspecies, FWS000799–807.

Specifically, the Service explained how "scientists have strived to understand, evaluate, describe, and classify the willow flycatcher … subspecies … [f]or nearly 70 years … under the scrutiny of the peer review process[,]" which is

41

"the most accepted and reliable process for assessing the quality of scientific information." *Id.* The Service found that the studies showed that the southwestern subspecies "could be satisfactorily distinguished" from other flycatcher subspecies using the "75 percent rule" based on color, wing formula, or both. FWS000400; *see also* FWS016331 (explaining that the "75% rule" is a threshold used for naming subspecies where an entity qualifies as a subspecies if "75% of the individuals of each sample [are] correctly identified"); *see also* FWS000728 (addressing the 75% rule and noting its definition in a footnote in the Delisting Petition). In its survey of the post-listing scientific literature, the Service found continued support for the subspecies' taxonomic status based on "behavior (song), morphology (plumage), and genetics," along with the subspecies' "well known" and "stable" range. FWS000799; *see also* FWS000797–806 (discussing the Delisting Petition's alleged citation accuracy, the subspecies' range, post-listing studies evaluating the southwestern subspecies' classification, genetic sampling, application and evaluation of ecological niche modeling, song comparison between willow flycatcher subspecies, plumage coloration and analysis, the American Ornithologists Union's stance on subspecies classification, and Zink (2015)'s critique of the methodologies used to determine its subspecies status).

After this exhaustive review, the Service upheld the songbird's taxonomic status with support "from a broad group of professional ornithological

organizations." FWS000807. The Service's decision was also supported by the agency's "examination of the issues raised in the" Delisting Petition, "additional analyses of recent flycatcher studies evaluating diagnostic subspecies characteristics," and "information received in response" to the Service's request for comments on the Delisting Petition and the southwestern willow flycatcher's status as a valid subspecies. *Id.* In doing so, it recognized the "early debate" about the subspecies, but explained that this debate has been settled for now because "a broader body of published peer-reviewed studies and current quantitative evaluations … have supported southwestern subspecies classification." FWS000796 (citing 16 peer-reviewed studies in favor of subspecies classification). This broader body of work includes, but is not limited to, ornithological peer-reviewed journals, state wildlife agencies, federal research and wildlife agencies, environmental consulting firms, private institutions, and universities supporting the flycatcher's ongoing recognition as a valid subspecies. FWS0000796–797. Thus, the Service found that "[t]he conclusions over time (even as scientific methods and opinions evolve) from a wide variety of authors and institutions provide support for the recognition of the southwestern willow flycatcher subspecies." FWS000797. Ultimately, the Service found that "[t]he long history" of studies analyzing the southwestern subspecies' taxonomic status was "an important

component to consider when addressing potential taxonomic changes."
FWS000808.

In sum, the Service found that the best available science supported upholding the southwestern willow flycatcher's taxonomic status. But the Service did not stop there. Rather, the Service thoroughly explained how the best available science and "the biological expertise of the Department and the scientific community concerning the relevant taxonomic group[,]" 50 C.F.R. § 424.11(a), supported the subspecies' validity. Thus, rather than a bare "unvarnished" reliance on a "majority opinion," *see* Appellants' Br. 39, the Service's Denial applied several coats of review, fully satisfying APA principles of reasoned decisionmaking.

**B.     Cattle Growers' critiques of "non-clinal geographic variation" ignore the Service's analysis, which clearly articulated the non-arbitrary basis for its subspecies determination.**

Next, Cattle Growers distort the Service's purported reliance on "non-clinal geographic variation" in support of its subspecies decision, FWS000793, claiming that such a standard cannot constitute reasoned decisionmaking because it is allegedly "inherently non-falsifiable" and allows "the Service to inevitably produce an affirmative subspecies conclusion (or not) based on the information *it* decides to assess." Appellants' Br. 40. But their argument misrepresents how the Service reached its taxonomic determination, and they do not point to any scientific data or

information that the Service failed to assess. *See Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1089 (D.C. Cir. 2017) ("Appellees do not suggest that there are better studies available, nor do they meaningfully dispute that [the] studies' results are understated, requiring some extrapolation upward. Instead, they disagree with the Service's conclusion [about what] the studies show … Such competing views about scientific data and policy choices, however, fail to show that the Service's conclusions were arbitrary and capricious or contrary to law.").

To provide needed background, "a cline is a gradient of morphological or physiological change in a group of related organisms usually along a line of environmental or geographic transition." FWS000793. For instance, there would be smooth clinal variation within a species if its individuals were gradually smaller in size the farther away from the equator specific specimens were found. Non-clinal geographic variation, in turn, refers to differences in a trait (e.g., morphology, song, habitat and niche preferences, and genetics) between a species' sub-populations that do not follow a smooth gradient or linear trend across a geographical range. A "step cline," for instance, is "a non-linear break in frequency over geographic space," FWS000105, that presents as "a narrow geographic region of rapid change in character," FWS000793. As the Service notes, non-clinal geographic variation has persisted as a method to differentiate subspecies "since the mid-1800s." FWS000793.

45

Cattle Growers insist that non-clinal geographic variation is inherently problematic because, depending on the characteristics one decided to assess, someone may be able to arbitrarily differentiate any two given populations. *See* Appellants' Br. 41. Cattle Growers suggest that this could pose a problem if the "analysis of different characters … produce[d] different subdivisions" that were "not distributed in a concordant geographic manner," FWS016332 (Remsen (2010)) (cited in Appellants' Br. 41).

What Cattle Growers fail to show, however, is that the Service did not adequately support its determination that the southwestern willow flycatcher can be adequately distinguished from other willow flycatcher subspecies *in* a concordant geographic manner. Instead, they ignore the Service's explanation of how the southwestern willow flycatcher's unique characteristics both differentiate it from other willow flycatcher subspecies *and* occur along a relatively well-known boundary of intergradation. When doing so, the Service noted that while there is a region of intergradation between the southwestern willow flycatcher and other flycatcher subspecies, "it is not unexpected to find some introgression along a shared boundary of two subspecies[,]" because "[s]ubspecies are capable of interbreeding (which is why they are not species), but are frequently not expected to do so." FWS000801–802. Still, the Service found that the best available science established a recognizable boundary between the southwestern willow flycatcher

46

and other willow flycatcher subspecies when looking at their genetics, FWS000800–802, plumage, FWS000804–805, and song differences, FWS000803–804; *see also* FWS000799–800 (noting a recognizable boundary based on all three characteristics). Indeed, the Service noted that one study, Theimer *et al.* (2016), found evidence of a step-cline along the subspecies boundary based on genetics and morphology. *See* FWS000801, FWS000804. As such, Cattle Growers' assertion that these studies "do not identify *concordant* non-clinal variation in willow flycatcher subpopulations[,]" Appellants' Br. 45, is simply wrong.

Cattle Growers further attempt to show that this standard is somehow unfalsifiable by alleging that it allows the Service to pick and choose which science "it decides to assess."[7] Appellants' Br. 40. But Cattle Growers do not point to any information that the Service failed to consider and, instead, point to their disagreement with the Service about the science the Service ultimately found to be credible. Specifically, they point to disagreement between their preferred scientist, Dr. Zink, and Theimer *et al.* (2016), *id.* at 42, but the Service explained why it

---

[7] Cattle Growers speculate that the Service could endlessly subdivide listed populations at whim. Appellant's Br. 45. These hypothetical concerns are ungrounded. The Service must always support its decisions with the best available science. 16 U.S.C. § 1533(a)(1). Any subdivision made from whole cloth, lacking scientific support, would quickly be struck down. Regardless, "[w]ithout more, the theoretical possibility that an agency might someday abuse its authority is of limited relevance in determining whether the agency's interpretation of a congressional delegation is reasonable." *PDK Labs.*, 438 F.3d at 1192.

found Theimer *et al.* (2016)'s analysis more persuasive than Dr. Zink's, FWS000801–808. Regardless, "competing views about scientific data and policy choices … fail to show that the Service's conclusions were arbitrary and capricious or contrary to law." *See Defs. of Wildlife*, 849 F.3d at 1089.

Similarly, Cattle Growers proffer that Zink (2015)'s critique somehow proves that some of the studies the Service relied upon were flawed because they originate "from the presumption that these putative subspecies are correctly defined[.]" Appellants' Br. 42–43. That argument similarly fails to explain how any such presumption undermines the studies' analyses when the Service weighed Zink (2015)'s critique and found that it did not change the agency's determination that the southwestern willow flycatcher is a valid subspecies. FWS000807.

Ultimately, Cattle Growers are asking this Court to "rule on the relative merits of competing scientific opinion." *Sierra Club v. U.S. DOT*, 753 F.2d 120, 129 (D.C. Cir. 1985) (cleaned up). "Such competing views about scientific data and policy choices, however, fail to show that the Service's conclusions were arbitrary and capricious or contrary to law." *Defs. of Wildlife*, 849 F.3d at 1089 (citing *In re Polar Bear*, 709 F.3d at 3). Moreover, judicial review of such a debate, the analysis of which "requires a high level of technical expertise," requires deference to "the informed discretion of the responsible federal agencies," *Marsh*, 490 U.S. at 377 (quoting *Kleppe*, 427 U.S. at 412), as it is the Service, and not this

Court, that "is entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances." *Sierra Club*, 753 F.2d at 129. "The court's responsibility lies in assuring that the agency had before it all the data to make an informed decision that adequately took account of the important environmental concerns." *Id.* The Service did so here, and Cattle Growers point to no information that the Service failed to consider and, instead, simply disagree with the Service's scientific analysis.

Further, Cattle Growers simply fail to show that the Service's determination of the southwestern willow flycatcher's taxonomic status is not "falsifiable." Cattle Growers' Delisting Petition attempted to do just that by presenting Zink (2015)'s conclusion "that the southwestern willow flycatcher boundary is merely an arbitrary division of a smooth genetic cline." Appellants' Br. 18 (citing to the Delisting Petition's description of Zink (2015)). If the Service found that evidence of a smooth cline constituted the best available science—and was not flawed as the Service ultimately concluded that Dr. Zink's analysis was, FWS000801—that could falsify a prior subspecies determination based on non-clinal variation.

However, the Service's disagreement with Dr. Zink's analysis does not show that its approach was not capable of refutation but, instead, that the Service found that *the information Cattle Growers' provided* did not refute the information that

49

the agency found otherwise supported the southwestern willow flycatcher's taxonomic status. When doing so, the Service did not employ a dogmatic approach intent on adhering to its original taxonomic determination. On the contrary, the Service's thorough explanation shows that the agency remained open to considering new information that could cut against the southwestern willow flycatcher's taxonomic status. But, after reviewing the Delisting Petition, the Service concluded that while "Zink (2015) and [the Delisting Petition] raised questions about previous research, … they do not represent the best available scientific information sufficient to restructure the taxonomy of [the willow flycatcher] and negate recognition of the southwestern subspecies *E.t. extimus*[.]" FWS000808.

In the end, Cattle Growers' contentions amount to an attempt to relitigate whether the Service considered the best available science when it upheld the southwestern willow flycatcher's taxonomic status.[8] But as Cattle Growers have not identified any new scientific information that the Service did not consider in its

---

[8] This is also not a case based on speculation or surmise, or with "moving goalposts." *See* Appellant's Br. 47 (quoting *Qwest Corp. v. FCC*, 689 F.3d 1214, 1288 (10th Cir. 2012). The Service has been consistent regarding the criteria its considers when determining that the southwestern willow flycatcher is a valid subspecies, while at the same time seriously considering new science—including Zink (2015), the Delisting Petition, and Zink (2017)—challenging their prior determinations. The result is an exhaustive analysis of the southwestern willow flycatcher's taxonomic status, well-supported in the record. *See* FWS000793–808 (analyzing the flycatcher's taxonomic status in response to the Delisting Petition).

Denial, Cattle Growers "competing views about scientific data and policy choices … fail to show that the Service's conclusions were arbitrary and capricious or contrary to law." *Defs. of Wildlife*, 849 F.3d at 1089.

## III. The Service's reliance on the standards of the ESA and its implementing regulations does not raise constitutional concerns.

Cattle Growers raise the specter that the Service's non-clinal geographic variation approach "raises significant constitutional concerns." Appellants' Br. 41. However, there is reason for serious doubt about the significance of any would-be constitutional issues because Cattle Growers offer no concrete examples of how any supposed constitutional issues have affected Cattle Growers or their members. Regardless, their nondelegation and due process arguments fail.

First, addressing nondelegation, this issue is waived because Cattle Growers have raised their nondelegation legal theory for the first time on appeal. *See, e.g.*, *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 453 (D.C. Cir. 1990) ("It is … well settled that a party may not raise a new legal theory on appeal for the first time."). But even if Cattle Growers had properly raised this issue in the district court, nondelegation relates to whether Congress has violated the separation of powers principle by delegating too much power to an agency, not whether the agency has purportedly exercised too much discretion in its decisionmaking. *See Gundy v. United States*, 588 U.S. 128, 135 (2019). And Cattle Growers have not framed this case as seeking an interpretation of the "best"

51

meaning of "subspecies" supplied by *Congress* in the ESA. Rather, in arguing that the *agency* has not afforded a sufficient explanation as to how it has arrived at its conclusion, Cattle Growers (properly) presented the issue as a pure *State Farm* challenge to agency decisionmaking under the APA. *See* Appellants' Br. 2. Cattle Growers attempt to put a square peg in a round hole to turn this case—concerning whether the Service's taxonomic determination about the southwestern willow flycatcher was arbitrary and capricious under the APA—into something it is not.

To bolster their argument, Cattle Growers restate two illusory hypotheticals: (1) that the Service will list subspecies based on "purely the information or evidence [the Service] decides to assess," and (2) that subspecies determinations are "inherently immune from meaningful public or judicial scrutiny." *Id.* at 48. But Cattle Growers point to no information that the Service did not assess here, *see supra* at 47–48, and the district court's opinion below and the opinions of other courts demonstrate that meaningful judicial review is available*, see supra* at 36–37 (discussing *Lohn*, 296 F. Supp. 2d at 1239). Further, the Service's taxonomic determination is clearly subject to public scrutiny, as evidenced by the Delisting Petition itself. *See supra* at 49.

Also, Cattle Growers cry foul yet fail to address the factors set forth by the Supreme Court for an appropriate delegation. "[A] delegation is permissible if Congress has made clear to the delegee 'the general policy' [the agency] must

pursue and the 'boundaries of [its] authority.'" *Gundy*, 588 U.S. at 146. "Those

standards, the Court has made clear, are not demanding[,]" and the Court has

"almost never felt qualified to second-guess Congress regarding the permissible

degree of policy judgment that can be left to those executing or applying the law."

*Id.* (cleaned up). "Only twice in this country's history (and that in a single year)

ha[s the Supreme Court] found a delegation excessive—in each case because

Congress had failed to articulate *any* policy or standard to confine discretion." *Id.*

"By contrast, [the Court has] over and over upheld even very broad delegations[,]"

including "delegations to various agencies to regulate in the 'public interest.'" *Id.*

Cattle Growers point to no case where the Supreme Court, or any other

court, has struck down an agency's determination based on the nondelegation

doctrine, instead relying on a sole dissent. *See id.* at 149–59 (Gorsuch, J.,

dissenting). And this case is far from the appropriate case to do so given that

Congress has provided a clear "intelligible principle" to guide the Service when

deciding whether to list or delist subspecies by requiring the Service to make

listing determinations, including taxonomic determinations, based solely on the

best available science, 16 U.S.C. § 1533(b)(1)(A).

Cattle Growers' next suggestion that there is a "due process" problem with

the Service's Denial, *see* Appellants' Br. 49–50, is also unavailing. The

southwestern willow flycatcher has been listed as an endangered species for

decades and its "critical habitat" has been designated since 2005. Yet there is no evidence that "ordinary people" do not "understand what conduct is prohibited" within the range of the southwestern willow flycatcher as defined by the Service. *Id*. at 50 (citation omitted). On the contrary, the evidence shows that they *do* understand what conduct is prohibited. *See, e.g.*, Declaration of Hugh B. McKeen ¶¶ 20, 22, 25, ECF No. 25-3 ("McKeen Decl.") (noting the steps taken by Cattle Growers' member to act in accordance with the protections given to the southwestern willow flycatcher). There is also no evidence that Cattle Growers (or anyone else) have been subject to "arbitrary and discriminatory enforcement" based on the Service's determination that the southwestern willow flycatcher is a valid subspecies. *See* Appellants' Br. 50.

Further, Cattle Growers' conjecture that someone confused by the similarity in appearance of different willow flycatcher subspecies *could* be subject to an enforcement action has nothing to do with the validity of the Service's subspecies determination. *See id.* By way of analogy, ESA-listed grizzly bears and non-protected black bears (two indisputably separate *species*) can overlap and be confused by members of the public, but that does not render the listing of grizzly bears a due process violation.

Cattle Growers focus on the zone of intergradation—something the Service has explained "can be expected" between certain subspecies, FWS000793—

54

between the southwestern willow flycatcher and a northern subspecies to suggest a potential problem of being able to correctly identify listed flycatchers. Appellants' Br. 49. But this is illusory. To begin with, "few breeding flycatchers [are] known to occur in this boundary area[,]" FWS000801, so it is unclear whether this situation will ever arise in practice. Further, the zone of intergradation, representing the boundary of the subspecies, occurs through the northern extent of the bird's range in Utah, Colorado, and New Mexico. But Cattle Growers have provided no evidence that their members live or work near this boundary. *See* McKeen Decl., ECF No. 25-3 (stating that his cattle operation is near Alma, New Mexico, in the southwest quadrant of the state).

In sum, Cattle Growers have not supplied credible bases for *any* constitutional issues, let alone any significant concerns, warranting application of the constitutional avoidance doctrine to the Court's review of the Service's determination that the southwestern willow flycatcher remains a valid subspecies.

**CONCLUSION**

Notwithstanding Cattle Growers' recharacterization of this matter, it remains a routine challenge to agency action, evaluated under the APA's arbitrary and capricious standard. The Service's Denial, based on its taxonomic determination that the southwestern willow flycatcher remains a valid subspecies and at risk of extinction, was reasonably explained and substantiated by the scientific record.

55

Specifically, the Service clearly articulated the criteria—grounded in the best

available science and the expert opinions of the Department and the relevant

scientific community—the agency relied upon to confirm the bird's subspecies

status, consistent with prior determinations. Accordingly, the Service's Denial was

lawful, and the district court's ruling upholding the Denial should be affirmed.


DATED: November 1, 2024                  Respectfully submitted,

                                         */s/ Ryan Adair Shannon*
                                         Ryan Adair Shannon
                                         D.C. Cir. Bar No. 62394
                                         Center for Biological Diversity
                                         P.O. Box 11374
                                         Portland, OR 97211
                                         T: 971-717-6407
                                         F: 503-283-5528
                                         E: rshannon@biologicaldiversity.org

                                         Margaret E. Townsend
                                         D.C. Cir. Bar No. 65252
                                         Center for Biological Diversity
                                         P.O. Box 11374
                                         Portland, OR 97211
                                         T: 971-717-6409
                                         F: 503-283-5528
                                         E: mtownsend@biologicaldiversity.org

                                         *Counsel for Defendants-Intervenors-*
                                         *Appellees the Center for Biological*
                                         *Diversity and Maricopa Audubon Society*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,319 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

DATED: November 1, 2024          Respectfully submitted,

*/s/ Ryan Adair Shannon*
Ryan Adair Shannon
D.C. Cir. Bar No. 62394
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
T: 971-717-6407
F: 503-283-5528
E: rshannon@biologicaldiversity.org

Margaret E. Townsend
D.C. Cir. Bar No. 65252
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
T: 971-717-6409
F: 503-283-5528
E: mtownsend@biologicaldiversity.org