NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 24-5075

―――――――――――

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――――

NEW MEXICO CATTLE GROWERS' ASSOCIATION,

Plaintiff – Appellant,

v.

UNITED STATES FISH AND WILDLIFE SERVICE, et al.,

Defendants – Appellees,

v.

CENTER FOR BIOLOGICAL DIVERSITY;
MARICOPA AUDUBON SOCIETY,

Defendants-Intervenors – Appellees.

―――――――――――

On Appeal from the United States District Court
for the District of Columbia
Honorable Ana C. Reyes, District Judge
Case No. 1:21-cv-03263-ACR

―――――――――――

**FINAL REPLY BRIEF OF APPELLANT**

―――――――――――

PAIGE E. GILLIARD
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
Email: pgilliard@pacificlegal.org

CHARLES T. YATES
DAMIEN M. SCHIFF
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Email: cyates@pacificlegal.org
Email: dschiff@pacificlegal.org

*Attorneys for Plaintiff – Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

GLOSSARY ....................................................................................... iv

INTRODUCTION .............................................................................. 1

ARGUMENT ...................................................................................... 3

I. Cattle Growers *does not ask* for a universal definition—or even
a particular definition—of subspecies ............................................. 3

II. The best available science—an evidentiary requirement—cannot
override the ESA and APA's decision-making standards ............................. 5

III. The Service's non-clinal geographic variation standard
violates the ESA ............................................................................. 9

    A. The ESA's text, structure, and history dictate that a "subspecies"
must mean something more than "subpopulation of a species" ............ 10

    B. Unqualified non-clinal geographic variation cannot demonstrate
distinction beyond that of a subpopulation ............................................. 12

CONCLUSION .................................................................................. 18

CERTIFICATE OF COMPLIANCE ................................................... 19

CERTIFICATE OF SERVICE ............................................................ 20

# TABLE OF AUTHORITIES

## Cases

*Am. Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008)........................................................7, 9

*Amoco Prod. Co. v. Watson*,
  410 F.3d 722 (D.C. Cir. 2005),
  *aff'd sub nom. BP Am. Prod. Co. v. Burton*, 549 U.S. 84 (2006)................10–11

*\*Ctr. for Biological Diversity v. Lohn*,
  296 F. Supp. 2d 1223 (W.D. Wash. 2003),
  *vacated and remanded*, 511 F.3d 960 (9th Cir. 2007)....................................7–9

*Defs. of Wildlife v. Zinke*,
  849 F.3d 1077 (D.C. Cir. 2017)........................................................13

*In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig*,
  709 F.3d 1 (D.C. Cir. 2013) ....................................................................4

*PDK Lab'ys Inc. v. U.S. Drug Enforcement Admin.*,
  438 F.3d 1184 (D.C. Cir. 2006)........................................................13

*Shafer & Freeman Lakes Env't Conservation Corp. v.*
  *Fed. Energy Regulatory Comm'n*,
  992 F.3d 1071 (D.C. Cir. 2021)......................................................4–5

*Sw. Ctr. for Biological Diversity v. Babbitt*,
  215 F.3d 58 (D.C. Cir. 2000)................................................................6

*United States v. Menasche*,
  348 U.S. 528 (1955)........................................................................11

*Williams v. Lew*,
  819 F.3d 466 (D.C. Cir. 2016)........................................................18

*Yee v. City of Escondido*,
  503 U.S. 519 (1992)........................................................................18

---

\* Authorities upon which we chiefly rely are marked with asterisks.

**Statutes**

16 U.S.C. § 1532(16) ................................................................10–11

16 U.S.C. § 1532(20) .......................................................................7

16 U.S.C. § 1533(a)(1) .....................................................................7

16 U.S.C. § 1533(b)(1)(A) ............................................................5, 7

Pub. L. No. 93-205, 87 Stat. 884 (1973) .......................................11

**Other Authorities**

61 Fed. Reg. 4722 (Feb. 7, 1996) ...................................................8

*Oxford English Dictionary* (1973) ...............................................10

*Random House Dictionary of the English Language* (1967) .................10

S. Rep. No. 96-151 (1979) .............................................................11

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act. |
| Cattle Growers | Plaintiff-Appellant New Mexico Cattle Growers' Association. |
| CG Br. | Appellant's Opening Brief. Citations to internal pagination. |
| Denial | United States Fish and Wildlife Service's final rule denying Cattle Growers' Petition to remove the southwestern willow flycatcher from the list of endangered species, 82 Fed. Reg. 61,725 (Dec. 29, 2017), which can be found at App. 667–669. |
| DPS | "Distinct population segment" as that phrase is used in the Endangered Species Act, 16 U.S.C. § 1532(16). |
| ESA | Endangered Species Act, 16 U.S.C. §§ 1531–1544. |
| Finding | The notice of 12-month petition finding and 5-year review issued concurrently with the Denial and describing the Service's reasons for denying Cattle Growers' Petition, which can be found at App. 575–666. |
| Intervenors | Defendant-Intervenors-Appellees Center for Biological Diversity and Maricopa Audubon Society. |
| Int. Br. | Brief for Defendants-Intervenors-Appellees. Citations to internal pagination. |
| NMFS | National Marine Fisheries Service. |
| Petition | Cattle Growers' March 2015 petition to remove the southwestern willow flycatcher from the list of endangered species, which can be found at App. 489–532. |
| Service | Defendants-Appellees United States Fish and Wildlife Service; United States Department of the Interior; the Honorable Debra Haaland, Secretary of the United States Department of the Interior; and the Honorable Martha Williams, Director of the United States Fish and Wildlife Service. |

| Services | United States Fish and Wildlife Service and National Marine Fisheries Service, who together share authority for administering the Endangered Species Act |
| --- | --- |
| Serv. Br. | Brief for Federal Appellees. Citations to internal pagination. |

**INTRODUCTION**

The unqualified "non-clinal geographic variation" standard applied by the Service to affirm the southwestern willow flycatcher's subspecies taxonomy is unlawful. As Cattle Growers explains in its opening brief, this purported standard suffers from two defects that render it inconsistent with the APA's standards for reasoned decision-making: (1) its non-falsifiability renders it incapable of demonstrating statistically significant differences at the population level; and (2) it is incapable of demonstrating valid (as opposed to manufactured) "step clines," because as it was applied, such a standard could indicate such variation (or not) between *any* randomly divided flycatcher subpopulation—based purely upon one's data-sampling choices. *See* CG Br. 40–50. These defects also render the Service's standard inconsistent with the ESA's plain text, because the result is that a flycatcher subspecies becomes nothing more than a subpopulation of the broader species. Such an approach violates the ESA, because the ESA's text, structure, and history dictate that a "subspecies" must be more than a mere subpopulation of a species. *See infra* 10–11.

The Service and Intervenors do not meaningfully dispute Cattle Growers' core contentions regarding these defects in the Service's non-clinal geographic variation standard. *See infra* 13–14. Instead, the Service and Intervenors' responses are largely premised upon the view that Cattle Growers is seeking "a generally applicable,

1

bright-line test for identifying valid subspecies across all taxa," arguing that such an outcome is not required under the ESA. *See* Serv. Br. 19. But Cattle Growers seeks no such generally applicable definition—or even a particular definition—of "subspecies," in this litigation. *See* CG Br. 28–30. Rather, Cattle Growers argues that *the standard the Service applied* in denying Cattle Growers' Petition—unqualified non-clinal geographic variation—is unlawful. *See* CG Br. 40–50.

For similar reasons, the Service and Intervenors' "best available science" defense is misdirected. *See infra* 5–9. The ESA's evidentiary requirement that the Service rely upon the "best available science," cannot override the *legal* decision-making standards of the APA and the ESA. If the Service's chosen standard for delineating "subspecies" was unlawful or arbitrary, the fact the Service purportedly relied upon the best evidence to satisfy that standard cannot render the Service's action lawful.

This Court should reverse the judgment of the district court. And it should remand with instructions for the district court to vacate the Denial and remand the matter for the Service to determine whether, under a lawful and non-arbitrary standard, the southwestern willow flycatcher constitutes a separate subspecies, and thus whether the Service should initiate rulemaking to delist the bird.

# ARGUMENT

## I.  Cattle Growers *does not ask* for a universal definition—or even a particular definition—of subspecies

Much of the Service and Intervenors' response to Cattle Growers' argument is premised upon the view that Cattle Growers is seeking "a generally applicable, bright-line test for identifying valid subspecies across all taxa," Serv. Br. 19. *See also* Serv. Br. 35–39, 42, 45–46, 51–52; Int. Br. 25–26. The Service and Intervenors posit that requiring the agency to state what it means by "subspecies" in accordance with the principles outlined in Cattle Growers' opening brief, would hamstring the agency's decision-making by preventing case-by-case determinations, *see* Serv. Br. 45—arguing that case-by-case determinations are in fact permissible under the APA, *see* Int. Br. 25–31. These arguments attack a straw man. Cattle Growers seeks no such generally applicable definition of "subspecies," in this litigation. *See* CG Br. 28–30. And nothing in Cattle Growers' argument would preclude the Service from developing its taxonomic rules through individual listing determinations, so long as the resulting standards were applied consistently and any variation in application were justified by legitimate legal and scientific principle. *See* CG Br. 30–52. *See also* D.D.C. ECF No. 30 at 19–20. But, whether the adjudicatory-like process of producing such a standard is gradual or sudden, the agency must still articulate the standard in such a manner that satisfies the requirements of the ESA and the APA. The standard of unqualified "non-clinal geographic variation" applied by the Service

in denying the Petition, violates these requirements. *See* CG Br. 40–50. *See also infra* 9–17. That failure distinguishes this case from one in which the Service, while acknowledging that standards may evolve depending on the species at issue, had articulated a lawful standard or definition. *See In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.*, 709 F.3d 1, 14–16 (D.C. Cir. 2013) (upholding the Service's interpretation of "likely" to mean "the word's ordinary definition" and the agency's interpretation of "foreseeable" to mean "a 45-year period").

Cattle Growers likewise does not request a *particular* standard to be applied to the flycatcher. *See* CG Br. 38–52. For this reason, the Service and Intervenors are simply wrong to argue that the Service is entitled to heightened deference because Cattle Growers has called upon this Court to "direct the agency in a choice between rational alternatives" or otherwise "to settle the scientific debate." *See* Serv. Br. 32–33 (quoting *Shafer & Freeman Lakes Env't Conservation Corp. v. Fed. Energy Regulatory Comm'n*, 992 F.3d 1071, 1090, 1093 (D.C. Cir. 2021)). Cattle Growers has done nothing of the sort. Cattle Growers makes no request for this Court to direct the Service in a choice between any of the studies in the record—be that Zink (2015), or some other study.[1] Instead, Cattle Growers asks this Court to remand the matter

---

[1] Intervenors, for their part, go so far as to characterize Cattle Growers' concern as the Service's decision not to adopt "the views" of Dr. Zink. Int. Br. 37. Intervenors miss the point entirely. This litigation is not a contest of Dr. Zink contra mundum. Cattle Growers' arguments focus solely on the legal question of whether the Service,

for the Service to make such choices, after first articulating a lawful and non-arbitrary standard for evaluating the studies in the record. *See* CG Br. 52. In other words, Cattle Growers asks this Court to address the overarching legal framework so that *the Service* can *lawfully* "settle the scientific debate." *Shafer*, 992 F.3d at 1093.[2]

## II. The best available science—an evidentiary requirement—cannot override the ESA and APA's decision-making standards

The Service and Intervenors also spend significant time arguing that Cattle Growers' arguments fail, because in determining the flycatcher's subspecies status, the Service purportedly complied with the ESA's requirement, 16 U.S.C. § 1533(b)(1)(A), that it rely upon "the best scientific and commercial data

---

in this discrete action, has used a standard for subspecies delineation that is arbitrary, capricious, or contrary to law. *See* CG Br. 30–52. To the extent the Service's treatment of Zink (2015) and Zink (2017) is relevant to Cattle Growers' arguments, it is only that, by relying upon a standard of unqualified "non-clinal geographic variation," the Service precluded a lawful adjudication of the conflicts between these studies, and the other studies in the record. *See* CG Br. 40–50.

[2] For these reasons, the Service's position that Cattle Growers has forfeited its arguments because "Cattle Growers did not ask the Service to establish a bright-line standard for what constitutes a subspecies for the southwestern willow flycatcher or for any other species" in its Petition, Serv. Br. 36, is meritless. Cattle Growers does not seek such a standard in this litigation. Cattle Growers instead argues that the unqualified "non-clinal geographic variation" standard, as applied by the Service in rejecting the Petition, was arbitrary, capricious, and contrary to law, in violation of the requirements of the APA and the ESA. *See* CG Br. 40–50. Cattle Growers' particular critique of the non-clinal geographic variation standard is amply presented in the administrative record. *See* App. 356–357; App. 479; App. 545.

available," *see* Serv. Br. 43–45, 47; Int. Br. 27. But the ESA's best available science standard—an evidentiary requirement, *cf. Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 61 (D.C. Cir. 2000) (characterizing the ESA's "best available data" requirement as a question of "available evidence")—cannot override the *legal* decision-making standards of the APA and the ESA, *see* CG Br. 50–52.

The Service and Intervenors' defense is therefore misdirected. Cattle Growers does not challenge the Service's evidentiary evaluation of what data is the "best"— be that "morphology (plumage), behavioral (song), and genetics (haplotype)." Serv. Br. 27–31. Instead, Cattle Growers argues that the Service's chosen standard to operate on the data derived from the Service's evidentiary choices, is unlawful. *See* CG Br. 38–52. Cattle Growers argues that by relying upon a standard of unqualified "non-clinal geographic variation," the Service had no way to rationally evaluate the best available science in the record in a manner that satisfies the ESA plain requirements, and the APA's prohibition on arbitrary agency action. *See* CG Br. 40–50. The Service and Intervenors' "best available science" defense thus puts the cart before the horse. The command to consider the best available science cannot salvage the Service's use of an unlawful standard, because that command merely identifies the relevant evidence and data upon which any standard will operate.

This case is therefore distinguishable from *American Wildlands*, where this Court upheld the Service's determination that the westslope cutthroat trout was not

a threatened species—in part based on the Service's use of morphological data to estimate the population of fish subject to the threat of hybridization. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 998–1001 (D.C. Cir. 2008). But "threatened species" is a statutorily defined term, *see* 16 U.S.C. § 1532(20), for which the ESA provides an exhaustive list of factors to be considered, *see id.* § 1533(a)(1). Indeed, if anything, *American Wildlands* supports Cattle Growers' position because it presupposes that the Service (or the ESA itself) has resolved the logically prior question and articulated a lawful standard or definition, which is to operate upon the best available scientific data in the record. *Cf. Am. Wildlands*, 530 F.3d at 994 ("A species is . . . threatened when it is 'likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range[.]' . . . The ESA requires the Secretary to determine whether any species is threatened or endangered as a result of one or more identified factors . . . . The Secretary must make this decision 'solely on the basis of the best scientific and commercial data available to him.'" (quoting 16 U.S.C. §§ 1532(20), 1533(b)(1)(A)).

*Lohn*, upon which Intervenors heavily rely, is likewise instructive. *See Ctr. for Biological Diversity v. Lohn*, 296 F. Supp. 2d 1223 (W.D. Wash. 2003), *vacated and remanded*, 511 F.3d 960 (9th Cir. 2007). *Lohn* did not involve the delineation of a "subspecies" for purposes of the ESA. Instead, *Lohn* was concerned with

NMFS's application of the Services' joint distinct population segment policy, 61 Fed. Reg. 4722 (Feb. 7, 1996), to determine whether the putative Southern Resident orca was "significant" such that it warranted listing as a DPS. *See Lohn*, 296 F. Supp. 2d at 1232 ("Determination of whether a population is significant for purposes of the DPS Policy[.]"). *See also* 61 Fed. Reg. at 4725 (identifying "[t]he significance of the population segment to the species to which it belongs" as one of three elements to be "considered in a decision regarding the status of a possible DPS as endangered or threatened under the Act"). In the court's view, NMFS's analysis of the orca's taxonomy contained errors such that it did not rely upon the best available science— but the point was NMFS's "error likely affected *whether the significance determination was correct.*" *See Lohn*, 296 F. Supp. 2d at 1240 (emphasis added). *Lohn* accordingly demonstrates the interplay between the "best available science" as an evidentiary requirement, and the ESA's overarching legal standards— specifically, the Services' joint DPS policy's guidelines for determining "significance." The problem the court identified, was that NMFS's failure to rely upon the best available science, led to an *illegal application of the DPS policy* to the facts in the record. *See id.* at 1240–41 (discussing the "*[e]ffects* of NMFS's [f]ailure to [u]tilize [b]est [a]vailable [s]cience" (emphasis added)).

As both these cases demonstrate, the ESA's evidentiary standard of the "best available science," is subordinate to the ESA's overarching decision-making

standards—in *American Wildlands* the ESA's definition of "threatened species" and the factors for evaluating threatened status, *cf. Am. Wildlands*, 530 F.3d at 994, and in *Lohn*, the Services' joint DPS policy, *see Lohn*, 296 F. Supp. 2d at 1240–41. The best available science was of course probative to determining whether the ESA's standards had been met. But it did not act to override or otherwise define what the ESA dictated.

As such, if the Service's chosen definition of "subspecies" is arbitrary or unlawful under the statute, the fact the Service purportedly relied upon the best evidence to demonstrate that definition had been met, cannot render the Service's action lawful. Because the Service's unqualified "non-clinal geographic variation" standard is unlawful as a threshold matter, *see* CG Br. 40–50; *infra* 9–17, the fact the Service purportedly relied upon the "best" evidence to prove such variation cannot render the Denial lawful.

## III.    The Service's non-clinal geographic variation standard violates the ESA

As Cattle Growers explains in its opening brief, the unqualified non-clinal geographic variation standard applied to affirm the flycatcher's subspecies status is unlawful because its non-falsifiability renders it inconsistent with the APA's standards for reasoned decision-making. *See* CG Br. 40–50. This is because a standard of unqualified non-clinal geographic variation is (1) incapable of identifying mean differences at the population level; and (2) incapable of

demonstrating valid (as opposed to manufactured) step clines—when applying such a standard one could find step clines (or not) between *any* randomly divided flycatcher subpopulation, simply based upon one's data-sampling choices. *See id.* Due to these deficiencies in the standard, a flycatcher subspecies becomes nothing more than a subpopulation of the broader species. Such an approach also violates the ESA, because the text, structure, and history of the ESA dictate that a "subspecies" must be more than a mere subpopulation of a species.

**A.  The ESA's text, structure, and history dictate that a "subspecies" must mean something more than "subpopulation of a species"**

The ESA's text, structure, and history dictate that the term "subspecies" cannot merely refer to a subpopulation or "subdivision," *See* Serv. Br. 39 (citing *Oxford English Dictionary* 52 (1973); *Random House Dictionary of the English Language* 1418 (1967)), of a species. This is the case, for at least two reasons.

***First***, to interpret "subspecies" as denoting mere subpopulations of a species, would render the ESA's separate grant of authority to list "distinct population segment[s]" of species, *see* 16 U.S.C. § 1532(16), superfluous. If the Service's authority to list "subspecies" were to include the power to list any subpopulation of a species, such a grant would entirely subsume the Service's power to list "distinct population segment[s]." Such a construction violates the canon against superfluity. *Cf. Amoco Prod. Co. v. Watson*, 410 F.3d 722, 733 (D.C. Cir. 2005), *aff'd sub nom. BP Am. Prod. Co. v. Burton*, 549 U.S. 84 (2006) ("It is a familiar canon of statutory

construction that, 'if possible,' we are to construe a statute so as to give effect to 'every clause and word.'" (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955))).

***Second***, the ESA, as originally enacted, authorized the Service to list species, subspecies, and "smaller taxa in common spatial arrangement that interbreed when mature." Pub. L. No. 93-205, § 3(11), 87 Stat. 884 (1973). The ESA's "smaller taxa" language, however, was removed in 1978 and replaced with the DPS concept. *See* 16 U.S.C. § 1532(16) ("species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature"). As such, the ESA originally *did* grant the Service authority to list mere subpopulations below the species level. But Congress specifically removed this power in favor of the DPS concept. And importantly, the legislative history of the ESA reveals a clear congressional concern that this new DPS power should not result in a proliferation of listings. *See* S. Rep. No. 96-151, at 7 (1979) (noting that the listing of distinct population segments could provide a "great potential for abuse," and urging the Service to "list populations sparingly"). It cannot be the case that, in removing the "smaller taxa" language, Congress intended the retained term "subspecies" to encompass mere subpopulations—especially given Congress' clear aim that its amendments not result in a proliferation of listings.

**B. Unqualified non-clinal geographic variation cannot demonstrate distinction beyond that of a subpopulation**

The Service argues that it applied a standard of "non-clinal" geographic variation in certain characters of the flycatcher's genetic, morphological, and behavioral traits, when it upheld the validity of the southwestern willow flycatcher's subspecies status. *See* Serv. Br. 26–31. "[A] cline is a gradient of morphological or physiological change in a group of related organisms usually along a line of environmental or geographic transition." App. 583 (Finding). A "step cline" exists "[w]ithin a subspecies boundary area" where measured traits "show a nonlinear break in frequency over geographic space." App. 535 (Theimer (2016)). A "smooth cline[]" is a "gradual, linear change in genetic and phenotypic frequencies." *Id.* If a trait has a smooth or continuous gradation across geographic regions, then that trait does not suggest a distinct subspecies. *See* App. 594 (Finding) ("[A] gradual transition in traits is less suggestive of subspecies than a more fractured separation."). A more abrupt or non-linear ("step-cline") change across the geographic range of a species, on the other hand, indicates the existence of a subspecies. *See id.*

As Cattle Growers has explained, the *legal* problem with this non-clinal geographic variation standard, as it was applied in the Denial, is that its non-falsifiability, *see* CG Br. 41–46, renders it incapable of demonstrating mean differences at the population level. And because—based upon one's data-sampling

choices—one could find step clines when comparing *any* randomly divided flycatcher subpopulations, the standard is incapable of demonstrating valid (as opposed to manufactured) step clines. *See id*. Due to these defects, a flycatcher "subspecies" becomes nothing more than a subpopulation of the broader species.

The Service does not contend otherwise, pointing to nothing in the record to contradict Cattle Growers' argument. Serv. Br. at 33–34 (characterizing Cattle Growers' critique as merely concerned with "flaws it sees in the data relied on by the Service," and as a dispute about "competing views about scientific data and policy choices . . ." (quoting *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1089 (D.C. Cir. 2017))).[3] Nor could it. As Cattle Growers argues in its opening brief, a core concern of numerous studies in the record is that a standard for delineating subspecies based upon the type of unqualified "non-clinal geographic variation" the Service looked for in the flycatcher, is inherently non-falsifiable and enables the investigator to inevitably produce an affirmative subspecies conclusion (or not), based purely on the information it decides to assess. *See* CG. Br. 41–46. Such an exercise could produce "step-clines" in any randomly divided subpopulation, because "analysis of different characters may produce different subdivisions,"

---

[3] Intervenors likewise do not meaningfully dispute Cattle Growers' critique, instead characterizing it as an unduly hypothetical "theoretical possibility." *See* Int. Br. 47 n.7 (quoting *PDK Lab'ys Inc. v. U.S. Drug Enforcement Admin.*, 438 F.3d 1184, 1192 (D.C. Cir. 2006)).

FWS016332 (Remsen (2010)), creating a scenario whereby "different groups of scientists publish peer-reviewed papers that reach different conclusions from the same body of existing data, sometimes by differentially weighting particular pieces of evidence, or by excluding some evidence," App. 545 (Zink (2017)). In other words, as it was applied here, the standard is incapable of demonstrating true non-clinal geographic variation.

The following figures illustrate this data-sampling problem:



Figure 1



Figure 2



Figure 3

Figure 1 demonstrates a smooth cline in plumage coloration across geographic range—and thus no subspecies status. Figure 2 provides an illustration of a true step-cline—the existence of a sharp break in a particular trait across a species' geographic range. Figure 3 demonstrates how non-clinal geographic variation can be manufactured. Figure 3 is identical to figure 1. But in figure 3, data from the middle of the cline (between points A' and B'), is omitted, leaving one to compare data from the extreme ends of the cline (points A and B). The outcome is a sharp difference in plumage coloration—and a step-cline—because the data demonstrating the existence of a more gradual transition has simply been omitted.

As Cattle Growers explains in its opening brief, this problem is demonstrated by the various studies in the record examining the flycatcher's taxonomy. Decisive to each author's conclusion as to the existence (or not) of a step-cline, was the evidence—specifically the character or set of characters, or the geographic location of sample sites—each author considered. *See* CG Br. 42–44. For example, Unitt (1987) undertook to comparatively analyze character variation in willow flycatcher populations but did so with respect only to existing subspecies limits. App. 241–246 (Unitt (1987)). Sedgwick (2001)'s vocalization analysis admitted of a "sampling gap" which happened to "correspond[] to the geographic division in song features" thus "reducing the potential to detect gradation in song characteristics between areas." App. 480 (Zink (2015)) (summarizing Sedgwick (2001)'s methodology).

And Paxton (2010) relied upon morphological (coloration) data derived from "core" areas within the putative subspecies, stating explicitly that, "[b]ecause this study was intended to distinguish among established taxonomic units, we grouped breeding sites *a priori* into one of the four subspecies based on geographic ranges delineated via morphological studies. . . ." App. 345 (Paxton (2010)). In other words, these studies *looked for non-clinal geographic variation with respect to the putative flycatcher subspecies as historically defined*. I.e., they compared data from the extreme ends of the cline (points A and B), while omitting intermediary data (points A' and B') which might indicate a more gradual transition. Therein lies the problem with unqualified "non-clinal" geographic variation. The existence (or non-existence) of a step-cline, is determined purely by what that investigator decides to compare. Such a standard is incapable of demonstrating true step-clines.

This problem renders the Denial unlawful under the ESA's plain text. If one can find non-clinal geographic variation (or not) based purely upon one's data-sampling choices, a flycatcher subspecies becomes nothing more than a subpopulation of the broader species. And as discussed above, any interpretation of the ESA that would renders such a meaning for "subspecies," is contrary to the ESA's plain requirements. *See supra* 10–11.[4]

---

[4] Cattle Growers has not forfeited its nondelegation argument. *See* CG Br. 48–49. Cattle Growers' nondelegation argument is not a "constitutional claim," as the

# CONCLUSION

This Court should reverse the judgment of the district court. And it should remand with instructions for the district court to vacate the Denial and remand the matter for the Service to determine whether, under a clearly articulated, lawful, and non-arbitrary standard, the southwestern willow flycatcher constitutes a separate subspecies, and thus whether the Service should initiate rulemaking to delist the bird.

DATED: December 13, 2024.

Respectfully submitted,

CHARLES T. YATES
DAMIEN M. SCHIFF
PAIGE E. GILLIARD

/s/ Charles T. Yates
CHARLES T. YATES

*Attorneys for Plaintiff - Appellant*

---

Service suggests. Serv. Br. at 51 (citing *Williams v. Lew*, 819 F.3d 466, 471 (D.C. Cir. 2016)). Rather, it is an additional *statutory interpretation* argument (made under the canon of constitutional avoidance), as to why the Service's unqualified "non-clinal geographic variation" standard violates the ESA and APA. *See* CG Br. 48–49. Cattle Growers unquestionably argued in the district court that the Service violated the plain requirements of the APA and the ESA when it denied the Petition. *See* D.D.C. ECF No. 25-1 at 39–48; D.D.C. ECF No. 30 at 9–29. And Cattle Growers is entitled to further these *statutory* arguments on appeal. *Cf. Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.").

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(e)(1), excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1):

[X] this document contains 4,008 words, or

[ ] this brief uses a monospaced typeface and contains _____ lines of text.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this document has been prepared in a proportionally spaced typeface using Microsoft 365 in Times New Roman, 14 point font,

or

[ ] this document has been prepared in a monospaced typeface using [state name and version of word-processing program] with [state number of characters per inch and name of type].

DATED: December 13, 2024.

/s/ Charles T. Yates
CHARLES T. YATES

**CERTIFICATE OF SERVICE**

I hereby certify that on December 13, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Charles T. Yates
CHARLES T. YATES